ELETHA L. WIECHERS et al., Appellees, v. DENNIS POOL, Appellant.

**INSANE PERSONS:** Guardianship—When Appointment Proper. A
1   guardian should be appointed when it appears that the person in
question does not possess sufficient mental ability to understand
in a reasonable manner the business he is transacting, or the
nature and effect of his acts with reference to business affairs,
or if he has lost his reasoning powers to such an extent that he
is incapable of understanding and acting with ordinary discre-
tion in common affairs, and his property thus becomes subject
to loss at the hands of unscrupulous persons. Evidence reviewed
and held to justify the appointment made.

**INSANE PERSONS:** Guardianship—Order in Excess of Prayer. An
2   order appointing a guardian of the person, in absence of any
prayer therefor, is error.

*Appeal from Jackson District Court.*—HON. WILLIAM
THEOPHILUS, Judge.

FRIDAY, JUNE 18, 1915.

REHEARING DENIED SATURDAY, OCTOBER 30, 1915.

ACTION at law for the appointment of a guardian of the
property of the defendant upon the ground that he (defend-
ant) is a person of unsound mind. A temporary guardian of
his person and property was appointed and thereafter, upon
trial to the court without a jury, this guardianship was made
permanent, and the defendant appeals.—*Modified* and *Re-
manded.*

*Willard H. Palmer,* for appellant.

*F. D. Kelsey,* for appellee.

DEEMER, C. J.—Defendant is a widower about 86 years of age, now living with a son, S. W. Pool, on a farm in Jackson county, Iowa. His wife died in January of the year 1909, leaving the husband and five children surviving. Four of these children, all adults and all married, are the plaintiffs in this action, which was brought to have a guardian appointed for defendant's property, under Sec. 3219 of the Code, it being alleged that he (defendant) is of unsound mind and incapable of managing his ordinary affairs and of properly caring for his property. Defendant filed an answer controverting the allegations of the petition and, upon the issue thus tendered, a judgment was entered, finding the defendant unsound of mind and appointing a guardian for him and for his property. The appeal is from this judgment.

Before the death of his wife, defendant was the owner of a farm in Jackson county; but shortly after her demise, he sold the farm and his personal property, and went to live with his married daughter, Laura J. Blake, and her husband, remaining with them until March 24, 1914, when he took up his residence with his son, S. W. Pool. He received $8,000 for his farm, $2,000 of which was paid in cash, and the remainder was represented by a note, secured by mortgage upon the farm, the note drawing 5 per cent. interest, payable annually. This note and mortgage were deposited in a bank in Maquoketa, where the interest was paid annually and drawn out by the defendant at will. He also received some money from personal property, the exact amount of which is not shown. When he went to live with the Blakes, he agreed to pay them $150 per year for his board, and this afterwards was raised to $200 per year. Notwithstanding the fact that his wants were few, he expended practically all the cash he received for his farm and personal property, and the interest on his note, during the time he lived with the Blakes; and he also borrowed money from the bank and from two or three other persons, and failed to pay his board bill for two years. He also signed some notes as surety, and a judgment was rendered against him on some of these notes for approximately $500.

Some other notes were also outstanding at the time this action was commenced, and he owed several bills for merchandise.

On the 24th day of January, 1914, he made an assignment of his $6,000 note and mortgage to his son, S. W. Pool, with the verbal understanding that his said son should pay his honest debts, care for him while he lived, and give him a decent burial. Pursuant to this agreement, S. W. Pool paid his indebtedness to the bank, amounting to something like $198, and gave defendant $10 in cash. Some of the other children heard of this, and finding that there was no written agreement by S. W. Pool representing the consideration for the transfer, they took the matter up with S. W. Pool and, as a result, something like a week thereafter, S. W. Pool and the Blakes met with the defendant at a lawyer's office, where a paper was prepared for both defendant and S. W. Pool to sign, which was said to evidence the previous agreement between them. At this time, the Blakes and S. W. Pool had some words over the matter, but finally the agreement was signed by defendant, and at the same time S. W. Pool gave to Laura Blake a note for $410, covering defendant's board to March, 1914, and a note for $210, which had been made by defendant to Mrs. Blake. The children who were present did not, however, come to an agreement regarding the assignment of the note and mortgage, and the agreement between S. W. Pool and the defendant, as reproduced in the record, does not appear to have been signed by S. W. Pool. As the children who were present could not agree upon the assignment, this action was commenced within five days, that is to say, on February 4, 1914, and a temporary guardian was appointed for the person and property of the defendant. On the 24th day of March, 1914, defendant left the home of the Blakes, where he had previously been living in the town of Maquoketa, and went to live with S. W. Pool.

Prior to the time of the assignment, S. W. Pool had been a hard drinker, had frequently been arrested for intoxication, but had managed to accumulate something like $14,000 in property. The other children were not so well off, and one

of them was quite poor and had received frequent aid from defendant. Defendant left the Blake home without indicating that he intended to leave permanently and without taking any of his belongings with him. He had been ailing physically for something like fifteen years—had bladder or kidney trouble or both, was subject to chills and fever, which, at their height, affected his mind; gradually he became quite deaf and could not hear ordinary conversation. He had ceased active business, and his money was well secured and needed no attention. While a drinking man, he was, during his earlier years, shrewd, careful, and reasonably thrifty; but later in life and after the death of his wife, he became careless in his habits and in his business matters, signed notes as security for his son James, and borrowed small sums of money, as already indicated, for purposes not disclosed by the record. Some of the notes on which he was surety went to judgment, although defendant does not have any clear notion about these notes or about there being any judgment against him. He was apparently well provided for by the Blakes, and was not wanting for a home at the time he made the assignment of all he had to his son, S. W. Pool. His money was well secured and caused him no trouble or anxiety. The testimony tends to show that, after the death of his wife, defendant's mind and memory became impaired, and that he was easily imposed upon, particularly if "he had a drink". His wants were simple, and the interest on his note would more than pay for his board and clothes. He had no other business interests. It seems that S. W. Pool, when he became aware of the judgment which had been rendered against his father, concluded to defeat the collection of that judgment, and that he made a proposition, looking to that end, to some of his sisters, saying that he would get an assignment of the note and mortgage, and that he might as well have it as to let Jim (another son) get it all. S. W. Pool went with the father to the bank, paid the indebtedness to the bank, obtained the note and mortgage, and had the same assigned to him with nothing but an indefinite verbal understanding as to what

the father would receive, if anything, for the transfer. When some of the other children complained, a meeting was arranged to go over the matter, and the agreement which has already been mentioned was drawn by an attorney at law, and, after some wrangling on the part of the children, and some hesitation on the part of the father, was signed by him, just before this action was commenced.

There is testimony as to the impairment of defendant's mental faculties; as to his loss of memory of recent events; as to his talking in his sleep, and muttering to himself; as to disconnected and rambling conversations; as to loss of interest in his business affairs; and as to his lack of knowledge of simple business matters; and, in addition, proof of how he handled his money, how he borrowed from others when he was not in need; his failure to meet his obligations for board; and some testimony tending to show that he was unduly influenced by his son, S. W. Pool, into making the assignment.

Defendant was also a witness on his own behalf, and the trial court had the benefit of his presence and of hearing his testimony upon the trial. On this examination, he showed an unusual lack of interest in his property and what became of it, and forgetfulness of comparatively recent business transactions, and really gave no satisfactory reason for making the assignment of his note and mortgage. He had no recollection of the judgment against him and could not explain how he became obligated upon the notes which were the foundation of that judgment.

The testimony from those best acquainted with him indicates that he had so failed mentally as to be incapable of managing his simple business affairs; and that he did not understand the nature and effect of his transaction with his son,—that is, its effect on the final disposition of his property. True, there is much testimony, from those not especially familiar with defendant, to the effect that his mind is as sound as that of other persons of his age and bodily infirmities, but nothing to indicate that he had any intelligent grasp of his own financial condition, or that he con-

ducted his simple business affairs with any discretion. While many persons seemed willing to loan him small sums without security, they had no idea of what he was doing with his money, but were content to trust to his honor to repay them. It is also true that, until the climax in his affairs, his own children were content to deal with him as if he were sane. There was a suspicion upon the part of some of those with whom he dealt that he was not competent to transact business.

At the time he made the assignment to his son, the latter was a very intemperate man; although, shortly after he received the assignment, he took a so-called "liquor cure", and had refrained from drinking for several months thereafter. Others of his children or their husbands were responsible, and quite able to transact his business for him or to look after his needs, and they were men of character and reputation. Nothing is disclosed in the record furnishing any reason for the assignment, save perhaps a desire on the part of S. W. Pool to avoid the judgment against defendant, and if this were the purpose, defendant has forgotten it. The income from the note, or the principal thereof, would have been quite sufficient to sustain the defendant to the end of his life, and there was no reason for transferring the same to S. W. Pool. Defendant does not claim that he was under any obligation to this particular son; that he had any greater affection for him than for any of his other children; or that he expected at that time to go and live with him; or that he had ever supported him. On the whole, we are disposed to agree with the trial court in holding that he was and is a fit subject for guardianship.

I. While the case is close in its facts, some weight must be given to the finding of the trial court, who had all the witnesses before him, and who had the advantage of seeing and hearing the defendant during the trial and on the witness stand. This is especially valuable in all cases where mental competency is at issue. It is not our thought to broaden the law in such cases, and we have in mind the tests announced

1. INSANE PERSONS: guardianship: when appointment proper.

in our previous cases; for example, in *McGuire v. Moorhead,* 151 Iowa 25; *Arment v. Arment,* 134 Iowa 199; *Schick v. Stuhr,* 120 Iowa 396; *Emerick v. Emerick,* 83 Iowa 411.

Guardians should not be appointed either of the person or of the property of one simply because he is aged or infirm, or because his mind is to some extent impaired by age or diseased. On the other hand, the object of the statute under which this proceeding was brought is the protection of property; and if one does not possess sufficient mental ability to understand, in a reasonable manner, the business he is transacting, or the nature and effect of his acts with reference to business affairs, or if he has lost his reasoning powers to such an extent that he is incapable of understanding and acting with ordinary discretion in common affairs, and his property thus becomes subject to loss at the hands of designing or unscrupulous persons, a guardian should be appointed to manage his affairs. *Garretson v. Hubbard,* 110 Iowa 7. Each case must be determined upon its own particular facts; and on the whole record, we are disposed to agree with the trial court in finding that a guardian should be appointed.

II. Several rulings on the admission of testimony are complained of. We do not set them out; for they suggest no new or novel propositions of law. The rulings seem to be correct, or, in any event, not prejudicial to the defendant.

III. Without any prayer in the petition, the trial court, in its judgment, appointed a guardian for defendant's person and also of his property. This was evidently an oversight, and should be corrected in the district court.

2. INSANE PERSONS: guardianship: order in excess of prayer.

Appellee says the order is not broad enough to cover guardianship of the person, but we are disposed to think it is, and that the case should be remanded for such modification of the order as will make it clear that the guardianship is of the property only. This will be without costs to appellee.—*Modified* and *Remanded.*

WEAVER, EVANS and PRESTON, JJ., concur.