*In re* CHAPPELL'S ESTATE.

1. EVIDENCE—COMPETENCY—GUARDIAN AND WARD—INSANITY.
   It is not proof of mental incompetency, standing alone, that respondent frequently changed her mind, or made bad business bargains, or that she failed to pay the agreed amount for driving a well.

2. SAME—INCOMPETENCY—MENTALLY INCOMPETENT.
   Under section 8709, 3 Comp. Laws, the term "mentally incompetent" as used, refers to a person whose mind has become so affected as to have lost control of itself to such a degree as to deprive the person affected of sane and normal action.

Error to Berrien; Bridgman, J. Submitted June 22, 1915. (Docket No. 98.) Decided December 22, 1915.

Petition by Frederick Haselo, to secure the appointment of a guardian of Orilla Haselo Chappell. From a judgment in the probate court finding her incompetent, respondent appealed to the circuit court. Judgment for petitioner. Respondent brings error. Reversed; new trial denied.

*Harry A. Plummer* and *John J. Sterling*, for appellant.

*Harris S. Whitney*, for appellee.

This is a proceeding to obtain the appointment of a guardian of the person and estate of Mrs. Haselo, now Mrs. Chappell, upon the ground that she is mentally incompetent to have the charge, custody, and management of her person and estate. Mrs. Haselo removed from Cherry Valley, Ill., to Benton Harbor in this State on October 10, 1910. She was then about 72 years of age, and in good physical health, although somewhat deaf. Her late husband, Frederick Haselo, had been dead a little more than a year. Previous to his death he had been an invalid for some 11 years, during which time Mrs. Haselo had cared for him and looked after the business on the farm. Six children had been born of her marriage to Mr. Haselo, five of whom are living, and the youngest is upwards of 40 years of age. During the long period of her husband's illness, when she had the burden of caring for him and looking after the property, she says that the children gave her but little assistance and seldom visited her. When she came to Michigan, Mrs. Haselo was the owner of a life estate in a farm of 100 acres in Illinois, left her by her late husband. This property produced a rental of from $450 to $550 per year, but she seems to have had more or less trouble in obtaining payment of the rent. She also had a home in Cherry Valley worth about $1,100, and a place in Belvidere which was sold for $1,000. Her son testifies that she had also about $800 in notes. Shortly after coming here she purchased a house and four lots in Benton Harbor, and lived there until the following March. For the purpose of buying this property she borrowed $900 from her oldest son, Frederick Haselo, and to secure its payment she gave him a mortgage on her

home in Cherry Valley, due in two years, with interest payable annually. This mortgage the son foreclosed at the end of the first year, for nonpayment of interest. This is the same son who makes this application for the appointment of a guardian.

It does not appear that any of the children visited Mrs. Haselo after she came to Michigan. She says:

"My son Fred never came here to see me until he came to make this petition; then he came to see me with an officer."

In March, 1911, she went to live with one Edgar A. Chappell, a farmer in Berrien county, as his housekeeper; and at about the same time they entered into a contract in writing, bearing date the 20th day of March, 1911, by which it was agreed that Mrs. Haselo should do such work for Mr. Chappell as is usually performed by a housekeeper, and have her board and lodging, and that Mr. Chappell should look after her business affairs, collect her rents, about which she was having some trouble, and such other moneys as might be, or become, due her, and account to her monthly for all that should come into his hands. Neither was to have any further compensation for work done under the contract, and the contract was to be revocable at the pleasure of either. Shortly after this it was agreed between Mr. Chappell and Mrs. Haselo that they would be married; and in view of the fact that she was to become his wife, it was her wish, she says, that he should have the use of her property during his lifetime, the principal being so secured that it would eventually come back to her children. In September, 1911, she executed a deed of her Benton Harbor property to a third person and had the same reconveyed to herself and Mr. Chappell jointly, so as to make a home for him, she said, if his farm should be taken away. On the 9th day of December, 1911, they entered into a further contract, whereby Mr.

Chappell was to care for, maintain, and support Mrs. Haselo so long as she might live, and provide her with medical attention and necessaries, in consideration whereof she was to do his housework and turn over to him, for his use, all her moneys and personal properties, together with all rents and income to which she might be, or might become, entitled. By the agreement Mr. Chappell was to have the use and benefit of these moneys so long as he should live; and at the end of each year he was to execute to her a mortgage on 40 acres of land conditioned for the repayment of the amount he had received during the year, such repayment to be made one year after his death, without interest. The agreement also contained the following clause:

"In the event that second party leaves the home of the first party or refuses at any time to fulfill the conditions of this agreement, then the moneys so paid to first party shall be held by him as stipulated damages for nonperformance of the contract, and this agreement terminated."

A few days after making this agreement, and on December 16, 1911, Mrs. Haselo let Mr. Chappell have $1,255, for which he gave her a mortgage on 40 acres of land due one year after his death, without interest. This land was already incumbered to the extent of from $1,400 to $1,800, as Mrs. Haselo was told at the time. When the money was advanced it was with the understanding that it should be used in the discharge of such earlier indebtedness; but an adjoining piece of land being for sale cheap, Mrs. Haselo advised Mr. Chappell to use it in the purchase of that land, rather than in the payment of the prior incumbrance. We are not told the value of this 40 acres by itself, but his entire farm of 100 acres is said to be worth $100 per acre. On March 2, 1912, she gave him $500 more, for which he made his note due one year after his death.

In June, 1913, at a time when Mr. Chappell was about to visit a relative at some distance, Mrs. Haselo made a memorandum of various sums of money that she had loaned him, exclusive of the amounts covered by the mortgage and the note above mentioned. She made two copies, with a view to protection if one should be lost, and asked him to sign them in acknowledgment of the receipt of the moneys designated. He did sign the papers, but before doing so inserted a statement reading, "This has nothing to do with, the mortgage at Plummer's is to be taken out of this." The amount acknowledged by the memorandum was $615. After Mr. Chappell had gone upon his contemplated visit, Mrs. Haselo became anxious about the statement he had inserted in the memorandum and took the paper to a lawyer's office. She was there told that Mr. Chappell's conduct throughout was very reprehensible, and that he was evidently attempting to defraud her, and she was advised to, and, being very much frightened, did, begin a suit in chancery against him to set aside the conveyance she had made and for an accounting and other relief. She also made an agreement with the attorney that he should have 15 per cent. of the value of all property recovered by him in the proceedings. At this time the contemplated marriage had not taken place, and had evidently been intentionally avoided by Mr. Chappell. An answer was filed, in which he denied, among other things, that he had ever promised to marry her. But before the suit could be heard, Mrs. Haselo and Mr. Chappell talked over their differences, and she filed with the clerk of the court a discontinuance. This was on the 4th day of November, 1913. When her attorney became aware that the suit had been discontinued by Mrs. Haselo, he at once communicated with her son Fred in Illinois, who immediately came to Michigan; and, on the 10th day of November, began these proceedings

for the appointment of a guardian. He did not attempt to get any explanation from his mother before the citation was issued and served. On the 13th day of December, 1913, a hearing was had before the probate judge, on the petition, and she was adjudged to be mentally incompetent to have the charge, custody, and management of her person and estate, for the reason, as stated in the order of the probate court, "that she is unable to comprehend or realize the results or nature of the matters and transactions into which she has entered," and because "it would appear that unless some person is appointed to protect her interests she stands in great danger of being deprived and defrauded of a considerable portion of her estate." On the 2d day of January, 1914, Mrs. Haselo took an appeal to the circuit court, where the matter came to trial before the circuit judge and a jury on the 2d day of March, 1914. But before the hearing in the circuit court, and on the 17th day of January, she and Mr. Chappell had been married, and had rearranged their property matters so that the house and lots in Benton Harbor and 40 acres of Mr. Chappell's farm were conveyed to them jointly, as husband and wife. On the trial in the circuit court, the son, Frederick Haselo, testified as follows:

"*Q. The Court:* You may state any fact or circumstance within your knowledge that will have any— throw any light on the question of the competency or incompetency of your mother.

"*A.* Only what I saw myself is it?

"*The Court:* What you know.

"*A.* I was not there at all times. Of course, her being queer in different ways, doing and having Mr. Hall there to do her business for her, and then tell me to do one thing and turn around and in probably a few minutes tell me to do something else to the contrary, had a tendency to make us think or believe that she was not just right. That they saw very frequently.

"*Mr. Sterling:* That is your answer to the court's

question? That is all you can state about it, is it?
That is all you recall now?

"*A.* Yes, sir.

"*Q.* On that subject?

"*A.* Yes, sir.

"*Q.* Is that so or not?

"*A.* Yes, sir. Mr. Hall was administrator of my
father's estate with the will annexed."

John F. Whiteman, son-in-law of Mrs. Haselo Chap-
pell, also testified:

"*Q.* Is there any fact or circumstance that you can
remember now connected with your mother-in-law that
would make you believe that she was not mentally com-
petent? * * *

"*A.* I can only speak of my own experience with
her; I have had little dealings with her; I have lived
in her property 10 years; she would agree to have
things done; then after it was done she would not
agree to settle for them; after I had moved out of her
property she wanted me to take charge of it and rent
it; I have letters—not with me—to collect rents and
one thing and another, which my wife did for her and
then finally put it into another man's hands to attend
to it as we did not care to bother with it. One time
we was there, lived there, there was no provision for
water, and she told me if I would put down a partner-
ship well with a neighbor there, she would stand for
it, and pay her share, and afterwards she backed down
flat and left me that expense. I had several little mat-
ters that way when she would be obstinate. Of course,
my not being a direct relative, I didn't pay much at-
tention to it."

The foregoing is all of the oral testimony offered
in proof of mental incompetency. Neither the other
children, nor any neighbor or acquaintance, was called
to testify in that behalf. Counsel for petitioner then
put in evidence the note and the mortgage above men-
tioned, the deed of the Benton Harbor property, the
several agreements referred to, the finding of the pro-
bate judge, and the bill of complaint, together with
the answer in the chancery suit, and rested.

In defense Mrs. Haselo Chappell testified fully relative to the transactions mentioned, and as to her intentions and purposes, in, and relative to, the same. She was cross-examined at considerable length. Two physicians from Benton Harbor were produced who had made examination as to her competency, each of whom gave it as his opinion that she was mentally competent in every respect. One of these physicians testified as follows:

"*Q.* Doctor, is it possible for—in your judgment and opinion—for a person to respond to all the tests you applied and everything you did to this woman, and she be incompetent to transact ordinary business affairs?

"*A.* I don't think it is possible."

Also one of her attorneys took the witness stand, and, after relating various business transactions that she had had with him, or in his presence, gave it as his opinion that she was "a mighty shrewd and remarkably well-preserved woman physically and mentally."

No rebutting testimony was offered in behalf of the petitioner. The jury returned a verdict that Mrs. Chappell was incompetent. Neither Mrs. Chappell herself, nor the physicians, nor her attorney were examined in the probate court. At the close of the testimony in support of the petition, and again when the evidence was all in, the court was requested to direct a verdict in favor of the respondent, but each request was refused.

PERSON, J. (*after stating the facts*). The application in this matter was made under the provision of section 8709, 3 Comp. Laws (4 How. Stat. [2d Ed.] § 11565) ; and the term "mentally incompetent," as used in that section, has been defined by this court in a number of cases.

"It does not refer to persons who are sane, but not, perhaps, as wise or intelligent as some other persons. It applies to those whose mind is so affected as to have lost control of itself to such a degree as to deprive the person afflicted of sane and normal action." *In re Guardianship of Storick*, 64 Mich. 685 (31 N. W. 582).

"The statute contemplates the existence of insanity or of mental infirmity that is equivalent in destroying mental competency." *In re Asa B. Brown*, 45 Mich. 326 (7 N. W. 899).

When this court in *Re Estate of Leonard*, 95 Mich. 295 (54 N. W. 1082), said that "incompetent" and "incapable," as used in the statute, were regarded by the legislature as synonymous terms, it did not intend to be understood as meaning that any one was mentally incompetent who was incapable of conducting his business successfully, but rather that the word "incapable," as used in the statute, was synonymous with "mentally incompetent" in the sense above defined.

There was nothing whatever in the testimony of Mrs. Haselo's son, or in that of her son-in-law, that tended in any degree to show such "mental incompetency" on her part as would authorize the appointment of a guardian of her person and estate. All they said is as consistent with competency as with incompetency. The son tells us that Mr. Hall was the administrator of his father's estate, and he gives us no reason whatever for thinking it "queer" that his mother should have had Mr. Hall do her business. Nor, without giving some specific instance in illustration, is incompetency indicated by the son's statement that his mother would tell him to do one thing, and in probably a few minutes tell him to do something else to the contrary. The only act showing incompetency on Mrs. Haselo's part, that the son-in-law could think of, was her failure to pay what she had promised for the putting down of a well, and it is absurd to call that an indication of the mental incompetency required by the statute. And

Mrs. Chappell explains the circumstances by telling us that she was unable to keep her promise because this same son-in-law would not pay the rent that he owed her.

All of the evidence in support of the petition, other than the foregoing, was the various agreements with, and conveyances to, Mr. Chappell, and the pleadings in the chancery suit. That these agreements and transfers were injudicious must be conceded. The attorney who advised Mrs. Haselo that Mr. Chappell was aiming to defraud her had apparent grounds for the advice. But it must be remembered from Mrs. Haselo's viewpoint she was dealing with the man whom she was about to marry. And, as a general rule, the fact that one makes foolish bargains is not a reason, under the statute, why he should have a guardian appointed over him.

"If it were, a goodly number of people would be under guardianship." *Partello* v. *Holton*, 79 Mich. 372 (44 N. W. 619).

An improvident business transaction may be competent evidence in support of an application for guardianship; most of the acts of a respondent in such a case are competent as going to show the mental condition. But such an improvident act becomes cogent proof of mental incompetency only as it is reinforced and explained by other facts and circumstances.

And what are the other facts and circumstances in this case? Her children permitted Mrs. Haselo, at her age, to come to Michigan alone, and seemed to have no doubt of her ability to care for herself. Her son, who files this petition, not only loaned her a substantial sum of money, but foreclosed the mortgage given to secure its payment, at the first default in interest. He could have had no doubt of her mental responsibility. The attorney who began the chancery suit for her seemed to have no question of her competency to begin

such a suit, nor of her competency to make a contract with him by which he was to receive 15 per cent. of the value of the property recovered. Two doctors, whom the trial court seemed to hold in the highest respect, made thorough examination and declared her mind to be perfectly normal, and that she was fully capable of transacting business. One of her attorneys, who had seen a good deal of her in a business way, gave the same opinion. The testimony of these gentlemen was not contradicted or seriously questioned. Her son and son-in-law could not name one instance of any value wherein she had shown herself mentally incompetent. And beyond all, her own testimony, given quite fully in the record, indicates not only a normal mind, but a rather bright one. In the light of all these circumstances the improvidence of her dealings with Mr. Chappell does not become evidence that the jury were authorized to act upon in declaring her incompetent. She is now married to Mr. Chappell, and so far as the record shows they are living together contentedly. It is his duty to care for and support her.

The judgment of the circuit court is reversed, and a new trial will not be granted. The respondent and appellant will recover costs of both courts against the petitioner.

Brooke, C. J., and Kuhn, Stone, Ostrander, Bird, Moore, and Steere, JJ., concurred.

This case having been submitted on briefs, without oral argument, was reassigned after the death of Justice McAlvay.