ISABEL RICHARDSON, Appellant, v. L. T. RICHARDSON, Appellee.

No. 41873.

NOVEMBER 14, 1933.

David F. Loepp, for appellant.

Marks, Marks & Eik and Stason & Knoepfler, for appellee.

KINTZINGER, J.— The parties hereto are husband and wife, both residing in Sioux City, Iowa. The defendant was 73 years of

age and the plaintiff 66 at the time of the trial. They lived together as husband and wife for a great number of years.

Defendant's father was a pioneer resident of Sioux City and died in 1902 survived by his widow, who died a few years later, and five children: Leslie T. Richardson, the defendant herein, Alice O. Richardson, Gratia R. Caton, Mrs. Manley, and Mrs. Gertrude Patterson. His father's estate had never been divided and at the time of the trial was worth over a half a million dollars. This was owned jointly by the five children until some time prior to 1930. Before 1930, the appellee and his two sisters, Mrs. Caton and Alice O. Richardson purchased the interests of the other two sisters, thus becoming the owners of an undivided one-third of the estate. Such ownership continued until June, 1930. Mrs. Caton was about 77 years of age and in failing health. For this reason they started negotiations in 1929 to partition and divide the property. In order to accomplish this purpose it became necessary to have plaintiff join in the execution of deeds conveying certain real estate to defendant's sisters, Mrs. Caton and Alice Richardson.

Mrs. Caton's son, Louis Caton, resided in Oklahoma and came to Sioux City for the purpose of effecting a partition and settlement of the estate. The appellant refused to sign the necessary papers and deeds to accomplish this settlement until the second or third of June, 1930. After many heated and violent discussions between the appellant and appellee, she was finally induced to sign the necessary deeds. This was not done, however, until after appellee paid her the sum of $50,000 therefor. After she had received the $50,000 she asked him to give her another check for good measure, and he thereupon gave her another $1,000.

These parties were before us in another action entitled Isabel Richardson v. Alice O. Richardson, 216 Iowa 1205, 250 N. W. 481, in which the appellant sought to set aside some of the deeds referred to, on the ground of fraud and undue influence. The facts leading up to the execution of those instruments are substantially identical with those relied on in this action in relation thereto and are all fully set out in that action. We will therefore not attempt to restate them here. In that action we decided that the appellant failed to establish the grounds relied upon by sufficient evidence, and refused to set aside any of such instruments.

One of the principal grounds alleged in this action for the appointment of a guardian is also that appellee was so dominated

by his sisters and Louis Caton, his nephew, that he was fraudulently induced to sign the instruments in question. This evidence, together with other evidence, was offered in this case for the purpose of showing appellee's incompetency to manage his property. In the other action we held that appellant failed to establish fraud and undue influence, and we adhere to that finding here. We will, therefore, give such allegations of fraud and undue influence no further consideration here.

The other allegations of the petition for the appointment of a guardian are that for more than two years the defendant's mind has become so affected because of age and ill health that he does not have sufficient mental capacity to conserve, protect, and handle his business and property in his previously competent and normal manner.

At the conclusion of appellant's evidence the court sustained defendant's motion for a directed verdict for the defendant. Appellant contends that the court erred in failing to submit this case to the jury on the question of the sufficiency of the evidence to establish appellee's mental incompetency to handle his own business. Appellant contends there was sufficient evidence to take this question of appellee's mental incapacity to the jury.

It is the well settled law of this state that, where substantial evidence has been tendered on the part of the plaintiff to establish the defendant's unsoundness of mind and his inability to manage and control his business and property, the question then becomes one for the jury. Ferguson v. Ferguson, 183 Iowa 519, 167 N. W. 471; Smith v. Hickenbottom, 57 Iowa 733, 11 N. W. 664; McGibbons v. McGibbons, 119 Iowa 140, 93 N. W. 55; Brown v. Lambe, 119 Iowa 404, 93 N. W. 486.

It is equally well settled that where the evidence fails to show such an unsound mental condition as to render the defendant incapable of managing his own business and property, then it becomes the duty of the court to direct a verdict for defendant. Wood v. Wood, 129 Iowa 255, loc. cit. 258, 105 N. W. 517; Huffman v. Beamer, 198 Iowa 1113, loc. cit. 1116, 197 N. W. 476; Miller v. Paulson, 185 Iowa 218, 169 N. W. 203; McGuire v. Moorhead, 151 Iowa 25, 130 N. W. 140; McDermott v. Rahely, 146 Iowa 458, 125 N. W. 219; Arment v. Arment, 134 Iowa 199, 111 N. W. 812; Schick v. Stuhr, 120 Iowa 396, 94 N. W. 915; Lang v. Lang, 157 Iowa 300, 135 N. W. 604.

A guardianship proceeding is not necessarily adversary, but is presumed to be prosecuted and defended solely in the interest of the defendant. Timonds v. Hunter, 169 Iowa 598, 151 N. W. 961; McGuire v. Moorhead, 151 Iowa 25, 130 N. W. 140; Huffman v. Beamer, 198 Iowa 1113, 197 N. W. 476.

In Timonds v. Hunter, 169 Iowa 598, loc. cit. 608, 151 N. W. 961, 964, we said:

"No one other than the defendant has a legal interest in the result. And yet the correctness of the result is of the highest importance to the defendant. A judgment making the guardianship permanent puts him under disability as a *non compos mentis*. It not only deprives him of the present control of his property, but it renders him presumptively incapable, and perhaps conclusively so, of entering into any contract or making any testamentary disposal of his property."

The theory of this class of cases is that it is necessary to show by sufficient evidence that the defendant does not have sufficient mental capacity to carry on his own business affairs. Emerick v. Emerick, 83 Iowa 411, 49 N. W. 1017, 13 L. R. A. 757; McDermott v. Rahely, 146 Iowa 458, 125 N. W. 219; McGuire v. Moorhead, 151 Iowa 25, 130 N. W. 140; Lang v. Lang, 157 Iowa 300, 135 N. W. 604; Graham v. Clapp, 191 Iowa 1224, 184 N. W. 329; Coomes v. Mayer, 201 Iowa 405, 205 N. W. 645.

In Coomes v. Mayer, 201 Iowa 405, loc. cit. 408, 205 N. W. 645, 647, we said:

"The guardianship of a spendthrift or of one who is subject to evil habits may well be held over the ward for a time of testing his recovery of self-control. Nothing of that kind is involved here. In the very nature of the case the plaintiff's capacity to control her property cannot improve. The only fact appearing in the record as a reason for continuing this guardianship is the natural apprehension that her new husband has acquired sufficient influence over her to enable him to despoil her and to defraud her of her property. Such apprehensions are not to be indulged in. · The moral character of the husband is unchallenged."

In Graham v. Clapp, 191 Iowa 1224, loc. cit. 1225, 184 N. W. 329, we said:

"Since the statute is silent as to the indicia of mental unsoundness, we must resort to judicial opinion and definition. * * * Each case of this character is necessarily bottomed upon its own facts and upon final decision constitutes a weak precedent. * * * It is well settled that the unsoundness of mind which will justify guardianship must be more than mere debility or impairment of memory. It must be such as to deprive the person of ability to manage his estate. * * * The real test of mental unsoundness involves the competency of a person to manage his property and business affairs in a rational way. * * * The law of this case is well settled in Emerick v. Emerick, 83 Iowa 411, 49 N. W. 1017, 13 L. R. A. 757."

"Not every impairment of mind disqualifies one from the management of his property; unfitness to manage his estate judiciously is not sufficient. There must be such mental impairment as to render the subject incapable of understanding and acting with discretion in the ordinary affairs of life." 32 C. J. 630.

See, also, In re Wiechers v. Pool, 172 Iowa 422, 153 N. W. 65; In re Chappell's Est., 189 Mich. 526, 155 N. W. 569; In re Coburn, 11 Cal. App. 604, 105 P. 924.

In Wiechers v. Pool, 172 Iowa, 422, loc. cit. 428, 153 N. W. 65, 68, we said:

"Guardians should not be appointed either of the person or of the property of one simply *because he is aged or infirm*, or because his mind is, to some extent, impaired by age, or diseased. * * * The object of the statute under which this proceeding was brought is the protection of property." (Italics ours.)

If the evidence fails to show that any mental incompetency of a defendant deprives him of the ability to care for his property and to understand the nature and effect of what he does, the court may direct the jury to return a verdict for the defendant. Wood v. Wood, 129 Iowa 255, 105 N. W. 517; Ferguson v. Ferguson, 181 Iowa 1076, 165 N. W. 349; Miller v. Paulson, 185 Iowa 218, loc. cit. 221, 169 N. W. 203; Huffman v. Beamer, 198 Iowa 1113, loc. cit. 1116, 197 N. W. 476; McGuire v. Moorhead, 151 Iowa 25, loc. cit. 26, 130 N. W. 140.

In McGuire v. Moorhead, 151 Iowa 25, loc. cit. 28, 130 N. W. 140, 141, we said:

"It is the common lot of men to grow old. It is inevitable that if life is prolonged to old age the advance of the years will be marked by a greater or less decrease of bodily powers and mental efficiency. But, generally speaking, if that decrease be normal, that is, if it be such only as attends age unaffected by abnormal brain conditions, *there is no 'unsoundness of mind' within the meaning of the law, and nothing to justify a court in depriving a man of the control of the property which he himself has earned and saved. The purpose of a guardianship of this nature has sole reference to the preservation of the ward's property and estate.* [Italics ours.] The mere fact that he manifests the weakness, forgetfulness, and childishness of age is wholly immaterial, unless his debility has reached a stage where he cannot manage or intelligently direct the management of his own affairs, and his estate is liable to suffer material loss or waste for want of a responsible party in charge."

For these reasons the courts have invariably held that the evidence to establish mental incompetency will be closely scrutinized so that a person will not be unjustly deprived of the control of his property. Huffman v. Beamer, 198 Iowa 1113, loc. cit. 1117, 197 N. W. 476, 478. In that case we said:

"The proceeding bears some analogy to a will contest. In this class of cases we scrutinize the verdict more critically and interfere more readily than in any other class of litigation. The reasons for such scrutiny are even stronger in a guardianship proceeding than in a will contest. The courts cannot fail to observe the natural tendency of selfish interest to abuse this proceeding and to resort to it for wholly selfish purposes. The premature quarrels of expectant heirs are thrust upon the natural repose due to old age, and often result in despoiling the common benefactor and in destroying his status, and in depriving him of the liberty to do as he will with his own and in compelling him to eat his own substance out of a stranger's hand. These are some of the considerations which impel the courts to scrutinize an adverse verdict in a case where a plaintiff is necessarily dominated by a consideration of his own supposed interest, rather than by a tender regard for the best interest of the defendant."

In order to determine whether or not sufficient evidence was introduced in this case to show that defendant was mentally incompetent to manage his own property and affairs, it may be well to

review the substantial evidence offered thereon. It will be impossible to incorporate all of the evidence offered, but we will review the substance of it.

Appellant testifies that about ten or twelve times during the last two or three years appellee would wake up at 2 or 3 o'clock in the morning and cry out for help, exclaiming that the devil was chasing him; that on one of such occasions he crawled under the bed, exclaiming that "they are after me"; that he had a loss of memory and would talk to himself; that he frequently flew into a rage for no apparent reason; that he had four pairs of glasses and on one occasion, on being unable to find even one pair, he flew into a rage and threw furniture around the house, striking the appellant; that on a number of occasions when he found screen doors hooked he would cut the screen or jerk the door off the hinges; he eats rapidly and leans on the table with his elbows, although she asked him not to do so; that he frequently threatened her life; that on several occasions he turned on eight or ten lights and went upstairs leaving them burning; that at frequent times he had a change in moods, being sometimes jovial and sometimes very depressed; that he was much bothered about his business affairs; that on several occasions he closed the windows and turned on the gas. The balance of her testimony related to the dominating influence of his sisters and nephew upon appellee, and fraud in procuring him to sign deeds referred to.

Mrs. Carley, a nurse, while at the Richardson home to nurse the appellant in August, 1931, testified that she noticed Mr. Richardson during one of his spells get out of bed in the night; that he was under an hallucination; that during these times he was pale, seemed dazed, and wouldn't go back to bed; that she saw him walking about the house in an abnormal manner, going in and out of the house slamming the doors for apparently no purpose; that he talked to himself in an irrational manner; and saw him tear off screens.

Mrs. Lindsay, a neighbor, testified to one occasion when Mr. Richardson had become violent and had injured the plaintiff. That when Mrs. Richardson asked for one medicine tablet he said, "If one is good, two is better"; that the defendant seemed excited and didn't know what he was doing, and was pacing back and forth; that she was called over by Mrs. Richardson when her nose was bleeding after she had been struck by the defendant; that several

times she saw defendant walking the street waving his arms, talking, and laughing to himself.

Mrs. Richardson, Mrs. Carley, and Mrs. Lindsay all testified that in their opinion based upon the foregoing facts they believed the defendant was of unsound mind. The witness Mrs. Humphrey said she had a conversation with the defendant in regard to placing a loan for her; that he told her that he was turning all his business over to his nephew and could not handle things any more; and that he seemed very nervous and tired out.

Dr. Carney, an expert witness, in answer to a hypothetical question based upon the facts testified to by the foregoing witnesses, stated that in his opinion the defendant was of unsound mind, and that he was suffering from a form of senile dementia. On cross-examination, however, he testified that if the assumed person could give accurate details in regard to real estate and business transactions involving a large amount of property it would not fit into the picture of senile dementia. He also admitted on cross-examination that a person who could give the details of a loan made by him within a week of the trial, that one testifying as a witness for more than one and a half hours, and give in detail each piece of real estate, the number of acres and the valuation, and the details of the division of nearly a million dollars worth of property, giving the securities and the terms of settlement, does not fit in with the picture of senile dementia.

Mrs. Richardson also testified that much of the trouble started when Louis Caton, her husband's nephew, came to Sioux City; that it was apparent to her that he was completely dominating the defendant, and dictated what he should do about his property; that Louis Caton and his mother had the defendant completely bewildered and under their control.

The evidence fairly discloses that most of the friction between the parties hereto apparently grew out of the efforts being made by the defendant and his sisters for a division of their joint estate. It is also apparent that the storm broke when appellee requested his wife to sign the necessary deeds and papers to carry into effect the agreement entered into between appellee and his sisters for a division of their property. It is also fair to say that her refusal to sign these papers was the cause of his violence towards his wife, and that he may have treated her in a cruel and inhuman manner. The bone of contention was property which belonged to the appellee

and his sisters equally as heirs of their father's estate. He had already received a large amount of money from one of his sisters for his agreement to transfer his interest in certain real estate. In order to complete this transfer it was necessary to have his wife's signature on the deeds. His request that she sign these deeds was perfectly natural and normal under the circumstances, but was met with a storm of protest. One of his sisters was 77 years of age, he was 73, and another sister was also well advanced in years. They all desired to have their property partitioned so that each could control his own. Some time before he asked appellant to sign these deeds, he had already given her a deed to the home. His wife knew that all of the property was owned jointly by appellee and his sisters, she also knew that they contemplated a division thereof, and in order to make such division that it was necessary for her to sign deeds. Notwithstanding all this she refused absolutely to sign the necessary papers until after she had received $50,000 from her husband as an inducement therefor. Plaintiff had a good home and was never in want for anything; he had given her from two to three hundred dollars a month during a long period of years.

There is no testimony in this record tending to show that appellee was a spendthrift or was in any manner dissipating his estate. So far as the record shows he is able to manage and control his property in a usual and normal manner for a person of his age and experience.

The testimony shows that Mr. Richardson was a man of much business ability; that he had cared for and looked after over one-half million dollars worth of property for himself and his sisters for many years. There is no testimony in the record from any of his business associates, or persons with whom he had business dealings, that he was not able to carry on his own affairs or look after his own property in an ordinary manner. Appellee was called as a witness for plaintiff. While on the stand he gave the details of his family relations; told of the execution of a trust deed in which he had no direct interest whatsoever; told how the property passed from his father to the five children; gave in detail the location of the different properties; told how he and Mrs. Caton, the widowed mother of Louis Caton, and his sister Alice O. Richardson became the owners of the property; told of the interest of the other heirs; told how he had charge of the property, first as administrator, and afterwards as agent and manager of the estate; told of his desire to

give up the responsibility of managing the property, and his efforts, with the aid of Louis Caton, to make a partition and division of the joint properties; that some of the property was taken in his name and that of Louis Caton as trustees with a provision that if there should be any loss it would be borne equitably; told about the different farms and what each cost and the value thereof. He told about his loans, the amounts and the parties to whom made, the character of the security; told about how he had sustained a loss on cattle several years before; told about $10,000 worth of stock he had purchased in the Warrior Hotel Company, not as an investment strictly, but to enhance the value of the other property. He testified at length both on direct and cross examination about the scene in his office at the time the deeds were signed by the plaintiff, and about the payment to her of $50,000 for her signature, and of his giving her $1,000 additional.

The only expert witness called by the plaintiff was Dr. Carney, who in answer to the hypothetical question put to him on direct examination by plaintiff's counsel said that in his opinion such a person would be of unsound mind. On cross-examination, however, Dr. Carney admitted that a person conducting himself on the witness stand as did the appellee herein would not come within the picture of a senile dement. The doctor also admitted that a senile dement could carry on a small business and such people should be left to handle their business as long as possible; that it is a poor plan to take a senile dement away from his business, unless you can supply him with something else to do for his own good.

The evidence clearly discloses that the violent temper exhibited by appellee towards his wife was brought on by her refusal to sign the deeds and papers referred to. A quarrel between a man and his wife is not necessarily evidence of an unsound mind. The fact that a man becomes angry and violent when he is unable to find one of his four pairs of glasses is not necessarily evidence of unsound mind. The fact that he does not have the table manners suitable to his wife's taste would not necessarily show that he was of unsound mind. It is well settled that a mere impairment of memory is not sufficient to justify a guardianship. The fact that a person did any or all of the other things testified to by plaintiff's witnesses would not be sufficient to show that he does not have sufficient mental capacity to carry on his business and manage and protect his own property. In the last analysis the main question in this case is whether or not the de-

fendant has been shown to be of sufficient mental unsoundness as not to be able to carry on his own business and manage his own property. No such testimony has been shown in this record.

After a division of the estate property between himself and his sisters, and after a transfer of their shares to them, the appellee would have left only one-third of the property he had before, and only one-fifth of the amount of property he managed when the entire estate was in his hands. A division of this property so that he would only have control of his own share would necessarily result in relieving him from the burdens of its entire care. In our opinion the evidence fails to show that he was not able to properly manage and control his individual share of this property.

A careful analysis of all the evidence offered on the part of the appellant in this case fails to satisfy this court that there was sufficient evidence to warrant a jury in finding that the appellee did not have sufficient mental capacity to carry on his own business or manage his own property. We believe the judgment of the lower court in directing a verdict was not erroneous.

II. It is also contended that the court erred in permitting defendant on cross-examination of Dr. Carney to ask the hypothetical question put to him by appellee's counsel. Although this was assigned as one of the errors, it is not referred to in counsel's argument. Notwithstanding this fact and without reviewing the evidence in detail, it is sufficient to say that from an examination of the evidence introduced on both direct and cross examination, appellee's counsel was justified in asking the question, and we find no error in the court's ruling thereon.

The foregoing disposes of all the questions raised.

We believe the judgment of the lower court was right, and the same is hereby affirmed.

ALBERT, C. J., and STEVENS, KINDIG, ANDERSON, and MITCHELL, JJ., concur.