IN RE GUARDIANSHIP OF ROSS V. HAWK.
ROSS V. HAWK, Plaintiff, Appellant, v. L. V. RUSSELL, Guardian, Defendant, Appellee.

No. 44823.

October 24, 1939.

Rehearing Denied February 9, 1940.

Mills, Hewitt & Diltz, for appellant.

George J. Dugan, for appellee.

Bliss, J.—  On December 2, 1937, the plaintiff filed petition to terminate the guardianship of his property. Hearing was begun thereon on January 4, 1938, before the Honorable E. W. Dingwell, as presiding judge, at which time, both parties were represented by the present attorney for the appellee. Several witnesses testified on behalf of the plaintiff, but no testimony was offered by the guardian. Judge Dingwell expressed himself as being in some doubt about his decision, and no disposition was made of the matter. On July 19, 1938, on the application of the plaintiff, the judge made an order granting permission to the plaintiff to amend his petition, and continuing the hearing until the September term of the court. On the 7th day of September, 1938, the plaintiff, by his present attorneys, filed an amendment to his petition, wherein he alleged, among other matters, that the total receipts of the guardianship estate, since its inception in 1926, were $7,090.09, of which sum the plaintiff had received for his personal use,

including medical, and all other expenses, and the settlement of a divorce action, and fees of his attorneys therein, the sum of $562.25, while the sum of $2574.20, or nearly 37 per cent of the receipts, had been paid out for the fees and expenses of the guardian and his attorney. On motion, the court struck out the foregoing allegations as not being material to the issue before the court. There was no error in this ruling.

The guardian, in his answer, denied generally the allegations of the petition and amendment, admitted the guardianship, and alleged that the determination of the issue was for the court. He offered no testimony. The hearing was had before the court, with the Honorable Norman R. Hays, presiding. Testimony was introduced by the plaintiff and a transcript of the testimony before Judge Dingwell was submitted to the court.

The case was a troublesome one for both of the judges below, and its decision has not been easy for us.

The record discloses that the plaintiff was 37 years old on November 30, 1937. At the time of the hearing he had been a resident of Des Moines for about 12 years. He was reared on a farm in Dallas county. His mother died when he was about 12 years old, and he continued to live with his father and the other children, until he was 17 years old, when his father remarried. When his father died in 1923, the plaintiff, as one of his children, inherited an undivided one-fourth interest in a farm of 240 acres, and a like interest in a 40-acre homestead, subject to the life estate of his stepmother. There was also several thousand dollars worth of personal property. His share of the estate was fairly worth $12,000 or $12,500.

Spinal meningitis and other diseases afflicted him as a child, and left him with impaired health, until a few years ago. He was backward in his school work and learned with difficulty, and went no farther than the seventh grade in school. He could read and write. He had no business experience until he was 21 years old, at which time he bought a restaurant in Perry for $900, and operated it at a loss for about a year, and sold it for $400. Shortly after this he was placed under the guardianship of L. W. Flack. This guardianship continued until he was about 26 years old, when it was terminated on his own

petition, in an uncontested action. Testifying with reference to the operation of the home farm at this period, he said:

"They were quarreling and messing around over it and nobody getting a dime out of it and I got mad and sold out from under that set up. I lost patience and Byers encouraged me and I sold out."

Byers was an older man who had worked for his father when the plaintiff was at home. Plaintiff had confidence in him, and did not realize that Byers was a party to a scheme to cheat him out of his property. The land was worth $135 or $140 an acre. His share of the property was worth about $12,000. He was then about 26 years old. Within a week after the termination of the Flack guardianship, he had sold all of this property to one Jones for $2,000. Byers then told him he had a sister, whom plaintiff agreed to marry. Byers and some woman and the plaintiff, with the $2,000, then went to Kansas City. There was no marriage, but his associates took all of the $2,000 except three or four hundred dollars. At the time of the trial, 12 years later, he still had hopes of recovering the remainder of the $2,000, for he testified:

"Q. You were going to marry this girl, weren't you? A. That was my intention at that time, yes, sir.

"Q. They got most of your money, didn't they? A. They did, all but about three or four hundred. They haven't got it yet. They just think they have. I am not through yet. I may get the money some of these days. I am going after him. I know where he is at. They just think they have got it.

"Q. Where is he? A. I won't make a statement where he is but I know."

His brother, Clarence W. Hawk, then procured his appointment as guardian of the property of the plaintiff, on November 6, 1926. There was no hearing or contest, as the plaintiff consented in writing to the appointment. After proceedings had been begun to set aside the property transfer to Jones, the guardian procured the return of the property by the payment of $2,200. To raise this money he placed a mortgage on plaintiff's land, which had been increased to 80 acres by the acquisition of 10 additional acres from the estate. At the

time of the trial, this mortgage had been reduced to $625, by income from the land, together with some money from the sale of the homestead 40 acres.

During his residence in Des Moines, the plaintiff has been chiefly employed in various eating places, as dishwasher, yard-man, and fry cook. In all of his kitchen work he was under supervision of some one else. His wages have been from $12 to $14 a week, with board. He was so employed at the time of the hearing. For a while he had worked at common labor in the construction of one of the Maytag buildings at Newton. From there he went to Davenport, where he worked in a restaurant kitchen. In 1928 he joined the regular army, at Fort Des Moines, and served two years, during one year of which time he was a helper in the mess hall. He bought his discharge from the army for $100. He was married in 1933, over the objections of his guardian, and was divorced in November, 1937. He has never had any business experience, and has always worked for some one else. His employment has been steady. He has paid his bills. He has never been on relief. He drinks a glass of beer occasionally, dresses neatly, and the record disclosed no immoral conduct. He has chafed considerably about being under guardianship. On being asked how many lawyers he had personally employed during his guardianship, he replied: "I wouldn't know exactly but I have hired a few of them." He admitted that he had said that he would terminate the guardianship if it took all of his estate. The guardian has always permitted him to keep his earnings. He has been desirous of buying an automobile. He also wished to rent a vacant building across the corner, diagonally from the Randolph Hotel. In speaking of it he testified:

"Yes, sir, $20.00 a month and didn't have any lease. You can move it. That was a cinch."

His brother was discharged as guardian in September, 1936, and the appellee was then appointed. The latter has seen little of his ward. The following colloquy took place between the guardian and Judge Dingwell:

"Q. Do you think it is safe to turn the handling of that over to him now? A. That is up to you, Judge. I think—

"The Court: I think he is competent to manage his own

business affairs. I wouldn't question that a bit. To turn that eighty acres over to him, I just doubt it a little bit. Maybe it is all right. I will think about it. I want to ask Verne Russell a question or two anyway."

Apparently, the judge, by the word "business", meant the work at which the appellant was employed, and in the care of himself personally.

After the conclusion of the testimony on the hearing before Judge E. W. Dingwell, presiding judge, the following comment was made:

"The Court: In so far as releasing this man from his personal guardian, I wouldn't have any question about that. I would have some question about releasing this farm in the position it is now. I think this Guardianship, so far as the farm is concerned, ought to be held open until that farm is relieved of the mortgage. I would rather turn it to him free of debt than turn it to him with a debt upon it.

"I realize that this man—I have known of him for several years—I think he has been in my court once or twice. I am inclined to think he is in better condition now to handle his own affairs than he was the first time he was there. At that time he would not learn how to husband his resources; he just couldn't. Of course, there might have been some excuses for that. I am inclined to think there were. At that time he was married and I believe at one time he was in my court. He wasn't however living with his wife. They were separated from some cause or other. I don't know anything about that. She was making complaints. I think, as a matter of fact, that is what brought it up in my court, was complaints she had made. Those matters were adjusted.

"I am inclined to think he is in much better shape to look after himself now than he was then, but I do not know. I don't want to pass on it right at this time, anyway. To turn this farm over to him in the condition in which it is. There is only $625.00 left there. I see there is about $400.00 on hand. One more crop a year from now, with any kind of crop, that farm would be free from any indebtedness, except current taxes.

"I am inclined to think that the best thing could be done

would be to hold that farm under guardianship until it is released from the mortgage, but I am not going to say one way or the other, at this time.''

The witnesses who testified for plaintiff were associates in his restaurant work, excepting a psychologist. The latter, who had examined appellant for about 45 or 50 minutes, for the purpose of being a witness, testified:

''The 'intelligence quotient' as it is commonly called in the science of psychology, is a standard or unit of measurement of the mind. The range of the I. Q. in what are considered normally mental adults, is from 70 to 130. The average is 100.

''If a person tests below 70, they are considered feebleminded. If above 130, they are superior or geniuses.

''The I. Q. of Ross V. Hawk is 84. Basing my answer upon my own observation and experience, I would say that many people who have an I.Q. of 84 are handling their own business whatever it may be. The amount of schooling or experience that a man has had has nothing to do with the I.Q. of a person and had nothing to do with the 84 summary in this case.

''I have followed the career of a number of young men with a comparable I.Q. whom I have examined in years past, who have been successful in the conduct of business.''

His testimony was of little aid to either side. The following appears from his examination:

''The Court: The Court will ask a question, and you both may have exceptions. All exceptions saved.

''The Court: Q. You have been sitting here in the courtroom, and heard every word of testimony that was brought out on direct examination and on cross examination of Mr. Hawk as to the experience he has had, and his mode of living, and the different experiences he has had in handling business. Those matters that were brought out, as I understand you, have no bearing whatsoever upon the determination of what his i. q. test may be? A. That is right.''

The order of Judge Hays, appealed from contains the following:

"Under the showing made if it were on an application for the appointment of a guardian, I doubt very much if there is sufficient to warrant the Court in making such an appointment, as Ross V. Hawk is not, in my judgment, one who would be deemed mentally incompetent, but he is, in my judgment, one who is below average mentality, and has had no experience of any kind in the handling of business affairs, except one unhappy incident which occurred just before this guardianship was created, and which was the cause for the creation thereof. I refer to the sale or transfer of this particular tract of land, and which was after the creation of the guardianship, restored to him, or to his guardian. While it may be sort of disquieting to one to know that he is under guardianship, and that he cannot manage his property, yet the guardian has made no attempt to interfere with the personal earnings of the ward, and has devoted his efforts solely to looking after the real estate. Under the entire record I do not feel that it would be a kindness to the ward to release the guardianship, nor do I feel that there is a sufficient showing of capability upon the part of the ward to make it such as to require the Court to release said guardian.

"The application for discharge of guardian is overruled, with due exceptions granted."

In matters of this kind a large discretion is lodged in the trial court in determining whether the ward is a proper subject for the continuation of the property guardianship, and that his best interests will be best served by such continuance. Perry v. Roberts, 206 Iowa 303, 220 N. W. 85; Haworth v. Stanley, Iowa, 200 N. W. 410; Coomes v. Mayer, 201 Iowa 405, 408, 205 N. W. 645, 646.

As stated in Coomes v. Mayer, supra:

"Our reason for this attitude is that such refusal does not prevent a later consideration of the same question in the light of intervening events. Nor does it forbid a liberal and sympathetic administration of the guardianship in such a way as to curtail as little as possible the plaintiff's enjoyment of her property rights."

The appellant herein waived a jury trial, and the facts

found by the court have the same binding effect upon this court, as does the verdict of a jury.

■ The appointment of the appellee was made under the provisions of section 12614 of the Iowa Code, and apparently under subsection 1 thereof. The statute is silent as to what constitutes the unsoundness of mind mentioned therein, but this court has repeatedly held that it relates to the capacity of the affected person to transact business, and that the object of the statute is the protection of the property of the person within its contemplation, and its conservation for his benefit. Muller v. DeVries, 193 Iowa 1337, 188 N. W. 885; Emerick v. Emerick, 83 Iowa 411, 415, 49 N. W. 1017, 13 L. R.A. 757; Wiechers v. Pool, 172 Iowa 422, 428, 153 N. W. 65, 68; Graham v. Clapp, 191 Iowa 1224, 184 N. W. 329; Perry v. Roberts, supra.

"A person of unsound mind is one who is incapable of transacting the particular business in hand. He need not necessarily be an insane or distracted person, and may be capable of transacting some kinds of business, and yet be of unsound mind, and incapable of transacting business of magnitude, or at least of some degree of intricacy." Seerley v. Sater, 68 Iowa 375, 27 N. W. 263.

The accepted test of mental unsoundness is the ability and competency of a person to manage his property and business affairs in a rational manner. Richardson v. Richardson, 217 Iowa 127, 131, 250 N. W. 897; Miller v. DeVries, Wiechers v. Pool, Perry v. Roberts, all cited above; Claussen v. Claussen, 216 Iowa 269, 249 N. W. 397.

■ We recognize of course that the plaintiff, in a proceeding of this kind, is the owner of the property, and that he, alone, is the person most vitally interested, and that the discretion exercised by the court must be a sound, judicial discretion. Nevertheless the beneficent purpose of the guardianship statutes ought to be carried out. As stated in Haworth v. Stanley, Iowa, 200 N. W. 410, 411, supra:

"While we recognize the right of every person to conduct his own business and to manage his private affairs, nevertheless a guardianship should not be terminated when it appears in an action prosecuted for that purpose, that it will be detri-

mental to the welfare of the ward to have the guardian removed.''

Counsel on each side have cited many authorities, but they are of little aid except in the fixing of general principles. The facts in no two cases are alike, and each case must be determined on its own particular facts, and as stated in Richardson v. Richardson, supra, 217 Iowa on page 131, 250 N. W. on page 898, thereof, its ''final decision constitutes a weak precedent.''

From the record herein it is clearly evident that the plaintiff is mentally deficient; that in the past he was unable to cope with those having designs on his property; that he is still lacking in business judgment, and that unscrupulous persons will be ready and anxious to take advantage of his weaknesses. It was the judgment of each of the able trial judges that the guardianship should be continued at least for a time. While Judge Hays expressed doubt that the showing would be sufficient on an original hearing for appointment of a guardian, yet the fact that he found that the plaintiff had not sustained the burden which section 12623 placed upon him, convinces us that he had resolved the doubt against the plaintiff in his studied and deliberate conclusion and judgment.

While the discretion of the trial judge is not conclusive upon us in a matter of this kind, yet he had all the witnesses before him, and had the advantage of seeing, hearing and closely observing the plaintiff, which opportunity is particularly valuable in cases where the question is the mental competency of a person, and it is our conclusion that the findings and judgment of the court below were right and for the best interests of the plaintiff. The judgment is accordingly affirmed.— Affirmed.

OLIVER, C. J., and HALE, RICHARDS, SAGER, HAMILTON, STIGER, MITCHELL, and MILLER, JJ., concur.