Belle McGuire, Kate Ridgeway and Florence Moorhead, Appellees, v. John Moorhead, Appellant.

**Guardianship:** AGED AND INCOMPETENT PERSONS: EVIDENCE. To authorize the appointment of a guardian of one enfeebled by age, his debility must be such that he can not intelligently direct the management of his affairs, so that in the consequence thereof his estate is liable to suffer loss or waste.

In this action the evidence is reviewed and held insufficient to justify the appointment of a guardian of the estate.

*Appeal from Decatur District Court.*—Hon. H. K. Evans, Judge.

Tuesday, March 7, 1911.

Proceedings for the appointment of a guardian for John Moorhead, an alleged incompetent person. Guardian appointed as prayed, and the defendant appeals. *Reversed.*

*Stuart, Stuart & Stuart,* for appellant.

*V. R. McGinnis, C. W. Hoffman, Ed Sharp* and *Charles Steele,* for appellees.

Weaver, J.—The defendant is a man of seventy-nine years, and the plaintiffs are his daughters, who alleged that he has become enfeebled in body and mind, and ask the appointment of a guardian to take charge of his property. Upon their petition an *ex parte* temporary appointment was made, and subsequently, upon trial had to the court, by agreement, as in an equitable proceeding, that order was confirmed. The defendant has at all times denied his incapacity to prudently manage his own affairs, and by appeal brings the case to this court for review.

The issue is purely one of fact. The rules of law applicable to such controversies are fairly well settled, and are not the subject of serious dispute between counsel, though our attention is called to numerous decided cases which are thought to afford precedent for or against the judgment of the trial court. It may be said, however, that while legal precedents in point are always of value and never to be lightly disregarded, fact precedents are rarely if ever so perfectly applicable to a pending controversy as to be of decisive or .controlling importance, and this is peculiarly true where discordant domestic and family relations are to be investigated and the most irreconcilable conflicts of testimony are ever present. In its general outline the case before us is not unlike those of its class, unfortunately too numerous, where children, rightly or wrongly, appeal to the law to take from their aged parents the control and management of their own property. That such proceedings are sometimes proper and necessary for the protection of the parents can not be doubted, and in such case the child who in good faith sets them in motion is performing .a filial duty none the less imperative because disagreeable, or because it may expose him or her to unjust criticism. On the other hand, it is equally true that the law authorizing the guardianship of a man who has .lived to an .advanced age and by industry, thrift, and toil has accumulated a little property is one which is easily

abused, and not infrequently is made use of less to protect the parent and insure his comfort than to prevent his disposition of his estate to others than his expectant heirs.

The record discloses the following facts: John Moorhead lived with the wife of his youth until she died in the year 1905. Of this union there were born several children, of whom five survive. By industry, self-denial, and good management this husband, with the aid of his wife, had acquired a good farm of two hundred and forty acres and some other property to the aggregate value of $20,000. After his wife's death defendant rented the farm to a son-in-law, husband of one of the plaintiffs, with whom he made his home. So far as appears, his relations with his children were fairly harmonious, though it is evident he became somewhat restless, and indulged the thought of marrying again and reestablishing a home of his own. On August 8, 1908, he married one Martha Hattery, a divorced woman of fifty-three years of age. Though the marriage was somewhat hastily celebrated, the union was not unmarked by business prudence. An antenuptial agreement between the parties was reduced to writing, and duly executed, by which the wife waived all claims of dower or otherwise upon the estate of her husband in consideration of his undertaking to pay her $100 per year and furnish her a home and its usual comforts during his lifetime, and, in case she should survive him, the life use of a certain house and lot. Prior to this marriage he had made a will, the general effect of which was to provide for an equal distribution of his estate among his children. This will remains unchanged except for a codicil attached providing for a life annuity of $300 to his present wife should she outlive him. It was perhaps inevitable and to some degree pardonable that defendant's daughters should not welcome the idea of their father's second marriage. It was equally natural that the new wife should be keen to discern and quick to resent the coldness

of her reception into the family. However that may be, the "rift in the lute" of the Moorhead family dates from that hour, and the alienation thus begun gathered increase. of strength and bitterness until this proceeding was brought to place the father under guardianship.

In view of the importance of the case to the parties whose interests and family relations are involved, and with the deference due to the opinion of the learned trial court, we have examined the record with more than ordinary care, and a second reading of the evidence, to which a fuller reference will hereinafter be made, strongly confirms our first impression that the decree entered below can not be sustained. It is the common lot of men to grow old. It is inevitable that if life is prolonged to old age the advance of the years will be marked by a greater or less decrease of bodily powers and mental efficiency. But, generally speaking, if that decrease be normal, that is, if it be such only as attends age unaffected by abnormal brain conditions, there is no' "unsoundness of mind" within the meaning of the law, and nothing to justify a court in depriving a man of the control of the property which he himself has earned and saved. The purpose of a guardianship of this nature has sole reference to the preservation of the ward's property and estate. The mere fact that he manifests the weakness, forgetfulness, and childishness of age is wholly immaterial, unless his debility has reached a stage where he can not manage or intelligently direct the management of his own affairs, and his estate is liable to suffer material loss or waste for want of a responsible party in charge. The evidence before us reveals no such conditions. Giving the testimony offered by the plaintiffs the fullest credence and its utmost weight, the clear and decisive preponderance is to the effect that at the date of the trial John Moorhead was a man fully up to the average of men of his years in mental capacity and ability to manage the property he had accumulated and transact the

simple business in which he had been trained since his youth. The facts relied upon by the plaintiffs to justify their allegation of his incompetency have relation principally to his marriage and the circumstances under which it was contracted; the influence which his wife has over him and his alienation from his children; the fact that he refused to rent his farm to the husband of one of the plaintiffs and leased it to another person at a rental less than the son-in-law had offered him; the fact that he had contracted to sell his farm at a price alleged to be less than its market value; and that certain witnesses say he was childish and forgetful, was more liberal in the expenditure of money than in the former years, and was not in their judgment capable of managing his own business. On the other hand, two acting superintendents and one retired superintendent of our state hospitals for the insane, men of long and wide experience in the observation and treatment of mental diseases, united in testifying they had examined the appellant and satisfied themselves that he was entirely sane, and that, while he showed to some degree the debility which attends normal old age, his mind was sound, and he was entirely capable of managing his own affairs. This opinion is corroborated by a strong array of nonexpert witnesses, most of whom are persons having opportunity to know the conditions and speak with intelligent apprehension of the fact sought to be elicited. No expert witness undertakes to say that appellant is not of sound mind, while some of the nonexperts testifying for the plaintiffs so qualify their testimony as to render it of slight value. Concerning the renting of the farm, it may be said that the son-in-law, who had been occupying it at a rental of $500, wished to renew his lease and offered to pay $700 per year. The offer was refused, and the farm let to another person at $600. It is claimed that in thus doing appellant was influenced by his wife, between whom and McGuire there had been some

friction, and that in yielding to such influence he manifested weakness of mind. The proposed sale of the farm contemplated a price of $67.50 per acre, and an advance payment had been made, but this was returned to the purchaser by the temporary guardian. There was considerable testimony that the land was worth from $70 to $80 or more per acre, but it was also shown in defense that diligent effort had been made to find a buyer at $75 and less, and that the contract price was not materially below the fair market value.

It will be observed that the lease he did make was at a better rent by $100 than McGuire had been paying him, and while the latter offered a farther increase, it was after trouble had arisen in the family, and, in view of the existing want of harmony between the parties, we can not say it was an unreasonable or an insane act for appellant to refuse to renew the lease even at the proffered premium. So of the contract of sale. The price agreed upon may have been cheap, but if we give heed to all the evidence thereon it was not so inadequate as to suggest the thought that the seller was squandering his property.

Turning now to the fact and circumstances of the appellant's marriage, it is not unfair to say that here is the principal point of the plaintiffs' attack. It is said the marriage was contracted in haste, upon very short acquaintance with the woman he was making his wife, and without inquiry into her character and antecedents. It is further charged that this woman had been twice divorced, had been involved in various scandals, had led a disreputable life, and that the marriage had been brought about by her contrivance and management in order to absorb and acquire the appellant's property. Indeed, so prominently was that phase of the controversy featured on the trial below it is difficult to resist the thought that the issue of the appellant's sanity was lost sight of in the effort of the plaintiffs to thoroughly impeach the character of his

wife. But she is not on trial, and at the best. (or worst) her character, whether good, bad or indifferent, has only a remote bearing upon the merits of the real dispute the court is called upon to decide. It is not claimed that at the time he married her appellant had any knowledge or information that she was otherwise than a good and decent woman; and, conceding every fact concerning the marriage to be precisely as the plaintiffs claim them to be, they constitute a wholly insufficient basis for a conclusion that their father was lacking in mental capacity to control and manage his own estate. It may have been unwise for him to marry again so late in life, but, if so, it was a piece of unwisdom which finds its parallel in the lives of men whose eminence in science, literature, business, and statesmanship forbid any impeachment of their mental soundness. He married upon short acquaintance and brief courtship. So have thousands in whom no signs of senility have yet appeared. Whether his haste was due to the natural ardor of pursuit, or a desire to forestall opposition from his family, or a shrewd appreciation of the fact that a widower of his years had no time to waste, there is absolutely nothing in it to indicate mental incompetency to care for his property. It is further said that the woman came to the neighborhood for the express purpose of making the appellant's acquaintance and marrying him, and that it was she who managed to bring about their meeting and subsequent marriage. It is quite obvious that the lady was not a coy young maiden content to wait in the shadow until her knight should appear in a suit of armor and carry her away to his castle, but the fact that she violated the conventions by actively promoting her own matrimonial fortunes affords but the slightest grounds on which to infer the insanity of the man whom she selected as a desirable husband, nor is its significance greatly strengthened by the appellant's failure to be frightened away by the woman's advances. The sacred writer's declaration that

"it is in vain the fowler spreads the net in the sight of the bird" has no application to cases of this kind. Many men find a charm in the very boldness and audacity of the invitation which they never discern in more reticent tactics.

The appellant was wanting to marry. He talked with some of his friends on the subject, and one of the witnesses had advised him to find a good woman and make her his wife. He was clearly not deceived by the letter which invited him to call upon Mrs. Hattery. He went, he saw, and was conquered, just as all men from school-boy to gray-haired veteran have succumbed to Cupid's wiles ever since "Adam delved and Eve span." But notwithstanding the precipitancy of his surrender, there is evidence of his ability to keep the business section of his brain unclouded even when indulging in rose-colored visions of connubial felicity, for while so exhilarated over Mrs. Hattery's invitation to make her a call (his daughter says) he lay down on the lounge and kicked up his heels in the air, and immediately thereafter began and pressed his suit at a remarkable rate of speed, he secured the signature of the chosen one to an antenuptial contract by which she agreed to accept an exceedingly modest allowance in lieu of a widow's share in his estate. A man who can make so shrewd a bargain under such distracting circumstances can hardly be considered incompetent to transact business. In brief, the most that can be said of the case made by the plaintiffs is that appellant entered into a marriage which in the judgment of his family was ill-advised and liable to result in the diversion of his estate or some of it from his children, who, with their mother, his first wife, helped to accumulate it. But it must not be overlooked that he has done nothing which he had not the legal right to do, and so long as he keeps within that limit the court will not undertake to enforce his merely moral obligations. He might well have dismissed the thought of

another marriage and given the remnant of his age to the society, comfort, and help of his children. As he did not do it, it would have been equally well if the plaintiffs had repressed their feelings of disappointment and made the best of the situation. Even if they were convinced that the woman he had married had an unsavory history, it was doing him no kindness to pour the story into his ears, and it is scarcely to be wondered that the effort to destroy his confidence in his wife should have resulted in a rupture of the affectionate relations existing between father and daughters. Or, if he believed the story so told him and still reasoned that it was better to stand loyally by his wife than to become embroiled in a divorce proceeding, who shall say he made a mistake which discredits his soundness of mind? If he believes in her, as he swears he does, if she has made him a good and helpful wife, as he says she has, if he is competent to care for his property, as the clear preponderance of the testimony tends to show he is, there is no occasion for subjecting him to the indignity or the expense of a guardianship.

The decree appealed from is not sufficiently supported by the evidence, and is therefore reversed and cause remanded, with directions to dismiss the petition at plaintiffs' costs. *Reversed.*