NELLIE ZANDER, Appellee, v. FRED CAHOW, Appellant.

**EVIDENCE:** Opinion Evidence—Detail of Facts by Nonexpert. A
1   nonexpert may give his opinion that a person is mentally unsound
if the detail of facts upon which the opinion is based tends to
show that the mind of the person is not acting normally, *even
though such facts are not strong and persuasive proof of such un-
soundness.* (See Book of Anno., Vol. 1, Sec. 11846, Anno. 99 *et seq.*)

**TRIAL:** Instructions—Refusal of Incorrect Instruction. Instructions
2   which assert a person's right to use, manage, and dispose of his
property as he sees fit, without the qualifying clause ''if of sound
mind,'' are properly refused, when the instructions given embrace
the instructions asked, in so far as they are correct. (See Book of
Anno., Vol. 1, Sec. 11491, Anno. 48 *et seq.*)

**INSANE PERSONS:** Guardianship—Jury Question. A jury question
3   is created on the issue of mental unsoundness, in proceedings for
the appointment of a guardian of property, by testimony that the
person in question, by reason of the impairment of his mental facul-
ties, has no clear understanding of what he has done, or the probable
effect of what he has done on his estate, and that his property is
being mismanaged and is in danger of being lost thereby. (See
Book of Anno., Vol. 1, Sec. 12614, Anno. 11 *et seq.*)

Headnote 1: 22 C. J. p. 607.   **Headnote 2:** 38 Cyc. p. 1633.   **Head-**
note 3: 32 C. J. p. 658.

*Appeal from Adair District Court.*—W. S. COOPER, Judge.

DECEMBER 15, 1925.

APPLICATION for the appointment of a guardian for a per-
son alleged to be of unsound mind. From an order appointing
a guardian, following a verdict that the defendant was of un-
sound mind, the defendant appeals.—*Affirmed.*

*Wilson & Kellam,* for appellant.

*Musmaker & Musmaker,* for appellee.

VERMILION, J.—The proceeding is in probate for the ap-
pointment of a guardian. The jury found the appellant to be a

person of unsound mind, and the court appointed a guardian of his property.

The appellant was, at the time of the trial, 76 or 78 years of age, and a widower. He has four children, all adults. The appellee is the only daughter, and there are three sons, Elmer, Ralph, and Frank. He owns a farm of 240 acres, upon which there is a mortgage for $12,000; a town property, where he lives alone, for which he paid $900 many years ago, and which is now assessed for taxation at $1,600; and $500 in Liberty bonds. He had, at the time of the trial, some $700 on deposit in a bank. He is a Civil War veteran, and draws a pension of $50 per month. He moved from the farm to town some 25 years ago. Since 1906, some or all of his children have lived upon the farm. For some years, Elmer and Ralph have had the use of the farm, except that the appellee and her husband lived in the house and farmed part or all of one 40 acres for four years. None of the children have paid the father any rent. The sons Elmer and Ralph have rented portions of the farm to others, and received the rent. These sons, some years ago, purchased a farm of 160 acres, and became heavily indebted in so doing. They were also indebted to a bank in the sum of $8,500.

It is apparent that the immediate occasion for the institution of this proceeding by the daughter is to be found in the fact that the father signed the sons' notes to the bank for their indebtedness there, and later placed the $12,000 mortgage on his land, to take up these notes and enable the sons, in connection with a new loan upon their own land, to secure, by making a cash payment, a very considerable discount on their indebtedness, in addition to the payment.

With this statement of the general situation, we turn to a consideration of the errors assigned.

I. The appellee was permitted, as a witness, to say that, in her opinion, based on matters to which she had testified, her father was not of sound mind sufficient to manage his business. It is insisted that the witness had testified to no facts upon which such an opinion from a non-expert witness could be based. The witness had testified, in addition to matters of family history and some of the undisputed facts to which we have referred,

1. EVIDENCE: opinion evidence: detail of facts by non-expert.

that her father, on the occasion of a visit at the home of his son Frank, said that the bed was the best he ever slept in, and forgot that he had slept in the same bed on a former visit a week before; that he permitted the roof on the house where he lived to get in such bad repair that it leaked to an extent that there were holes in the plastering, and vessels had to be placed to catch the water; that he lived by himself, with no one to take care of things but the daughter, when she would go there; that he was not a good housekeeper; that he would make a quantity of coffee and drink it cold until it was gone, and lived "from paper sacks, bought crackers and what came handy;" that, on one occasion, when she was gone for four months, she found, on her return, all his shirts and his underwear very dirty; that her small boy, seven years old, found and was playing with some checks that the son Frank had used in studying bookkeeping in school many years before, and appellant insisted that they represented actual business transactions, and burned them, because he said he did not want all the town to know of Frank's affairs; that he took candy cigarettes from the boy, and said he knew cigarettes when he saw them, and that the boy had no business with cigarettes; that on two occasions he was unable to identify pictures of members of his family; that at one time, when shown a recent picture of his brother, he asked if it was his son Frank; that he slept with little or no ventilation in the room in summer; that at times he could not find his razor, although it was in the place where he had kept it for twenty years; that he marked articles he read in newspapers, so that he would not read them again; that on one occasion he went to the house of a friend, with other people, including two children, and later had forgotten the presence of the children; that he insisted he was only 76 years old, when family records showed him to be 78; that he said there was a mortgage for $10,000 on the 400 acres owned by his sons and himself, when the mortgage was for $12,000 on 240 acres owned by him.

The rule has been many times announced by this court that a nonexpert witness cannot be permitted to give an opinion that one is mentally unsound, without first detailing facts observed by him which tend, at least, to disclose that the mind is not working normally and that the person is not conversing or acting

in a normal manner; that the facts upon which the opinion rests must be such as tend to support or justify the conclusion; that they should appear in their nature somewhat inconsistent with mental soundness, or that the acts or talks were irrational or unusual, or such as would not ordinarily be anticipated from a person of his character. *Caltrider v. Sharon*, 164 Iowa 287; *In re Estate of Workman*, 174 Iowa 222.

Under this rule, we think the appellee was properly permitted to express her opinion of the mental condition of her father. It is true, most of the facts testified to by her tend to show an impairment of memory; and mere forgetfulness is not unsoundness of mind. Yet the facts testified to, taken as a whole, sufficiently tend to show a departure from normal to warrant the admission of the opinion of the witness.

II. Error is assigned on the refusal to give two instructions asked by appellant. It is sufficient to say, without setting out the instructions, that one was to the effect that appellant had a

2. TRIAL: instructions: refusal of incorrect instruction.

right to dispose of his property as he saw fit, and the fact that he assisted his sons was no evidence of unsoundness of mind; and the other referred to dissension among the children and to the motives of the appellee, and said that the jury should not aid any of the children in depriving the defendant of the right to use, manage, and dispose of his property.

Both instructions omitted the necessary qualification that the defendant, if of sound mind, might use and dispose of his property as he wished. If it was found that appellant was of unsound mind, it was the duty of the jury to so say, whether this resulted in depriving him of the management of his property or not. So far as the requested instructions were correct statements of the law, the subjects seem to have been covered by the instructions given, of which no complaint is made in this court.

III. The chief contention is that the verdict finds no sufficient support in the evidence.

The appellee is the only witness who expressed the opinion that the appellant was of unsound mind. Other witnesses, however, testified to various acts, conduct, and conversations of the

3. INSANE PER-
SONS: guardian-
ship: jury
question.
appellant from which, it is contended by appellee, such fact could properly be found. We shall not extend this opinion by setting out the testimony in detail, but summarize it as briefly as possible.

An associate of appellant's in the Grand Army organization, who saw him almost every day, testified that he repeatedly bragged about his farm and that it was all clear; that frequently men would pass whom they both knew, and appellant would ask who they were.

Another Civil War veteran who was often with appellant testified to his frequent repetition of stories and incidents of his earlier days; that on one occasion he made no reply, when solicited to contribute, with other members of the Grand Army post to which he belonged, to the purchase of markers for the graves of deceased members of the Women's Relief Corps, one of which was to be placed at the grave of his wife; but that, when the markers came, he took one and placed it at her grave, and seemed pleased.

A former brother-in-law of appellant's testified that he often said he paid the taxes on the whole 400 acres of land, including that owned by the boys; that the witness asked appellant how he expected the boys to. pay off the mortgage if they could not pay their taxes, and appellant said there was no mortgage on the place; that the witness said: "Aren't you mistaken? There is surely a mortgage on the place;" and finally appellant said, "I believe you are right."

The wife of the last mentioned witness testified that they occasionally called on appellant, and every now and then he came to their place; that sometimes he would go past, forgetting just where they lived; that she would say, "Here we are," and he would say, "I thought you were down this way further;" that on one occasion, when she and her husband had been away, and came home, appellant, with the appellee and her husband, was sitting on the steps; that appellant said there had been some people  down from Stuart, and he did not know who they were, and that they came to see him, and drove him down to see the witness; that she told him she had seen a car drive in, and some people get out, and asked him if there was a boy there; that he hung his head for a minute, and said he believed there was, and,

on being asked if there wasn't a woman or girl with a blue dress, he said he believed there was; that he was always talking about paying his and the boys' taxes; that, on being asked where the money went, when he put a mortgage on the place, he said he hadn't a mortgage; that, when told he had put a mortgage on the place, he argued a little, and finally said, "O, yes, you are right,—I remember that."

A witness who lived in the same block with appellant testified that they were good friends, and that appellant came to his place several times; that, on one occasion when the witness was working in the garden, appellant asked the names of different things there, and, standing right by them, asked what the beans and parsnips were; that several times he asked who lived there beside the witness; that three different times he asked who lived in near-by houses, and said he just couldn't remember; that, at different times, in a joking way, when the witness was passing, he would run out at him with his cane or a hoe or fork or stick, and draw it up as if he was going to stop the witness, and then commence talking; that, on one occasion, behind a bush in the yard, appellant jumped out and barked like a dog,—more like a hog; that they were always friendly and joking; that the witness considered these things in the light of a joke.

Appellant was called as a witness by appellee, and examined briefly. A portion of his testimony follows:

"Q. Mr. Cahow, did you put a mortgage on the place last spring? A. Well, I done that so they could save their farm. They expected to pay it off, and they will, too; they expected to pay that mortgage off. I had signed up some notes for them, and they expected to pay it off, so that they could get their farm paid for. Q. How much were you in debt at the Adair County Bank,—notes you had signed for them? A. Well, I don't think there was any, only that mortgage. Q. Don't think you had signed any notes to the bank? A. I don't believe I had. Q. Now, about this mortgage,—what company is that made to? A. Oh, I don't remember, but the two boys will pay that off all right. Of course there is a mortgage. Q. They told you they would pay off the mortgage on your farm? A. Yes, they will pay that off."

The testimony on behalf of appellant from the sons Elmer

and Ralph and the loan agent who procured the loan tended to show that appellant understood the transaction of giving the mortgage, and gave it voluntarily. Officers of the bank testified that appellant had an account there, in which he made deposits and on which he drew checks; and they and the loan agent testified that they never observed anything unusual in his conduct,— that he seemed to understand his business transactions.

The sons, whose debts the appellant has assumed, appear not to be successful farmers. The farm in their hands is not being kept up. The father has been paying their taxes, as well as his own, and receiving nothing from the farm. Their own land is heavily incumbered, and the prospects of their being able to carry out their avowed intention to pay the incumbrance on the father's land are by no means bright. The house where appellant lives is shown to be sadly in need of repair, and the same is true of the house on the farm. Neither appellant, although possessed of means to do so, nor those whom he allows to have the use of the property without rent, are taking any proper care of it. Much of the land is allowed to remain uncultivated, and is growing up in weeds.

Some of the things testified to by the appellee and witnesses called by her have slight tendency to show mental unsoundness. There is no evidence of physical ills that would result in mental impairment, but there is evidence of such a weakening of mental power, such a lack of proper understanding, not only of trivial and unimportant things, but of important financial transactions in which appellant engaged solely for the financial benefit of his sons, that we are not prepared to say that there was no sufficient evidence to take the question of mental soundness to the jury. While we have said that we will scrutinize a verdict more critically and interfere more readily in this class of cases, where the result is to deprive the owner of control of his own property, than in any other (*Huffman v. Beamer,* 198 Iowa 1113), yet the object of guardianship is to conserve the property for the owner; and the test is the ability of the owner to manage his property and business affairs in a rational manner. *McGuire v. Moorhead,* 151 Iowa 25; *Wiechers v. Pool,* 172 Iowa 422; *Graham v. Clapp,* 191 Iowa 1224; *Muller v. De Vries,* 193 Iowa 1337.

We do not question the natural right of a parent to assist

his children, or to aid some to the exclusion of others, and recognize the fact that courts are slow to deprive the owner of property of the right to do with it as he pleases, in the interest of expectant heirs; yet, where there is evidence, as there is here, that he has, by reason of impairment of his mental faculties, no clear understanding of what he has done or the probable effect upon his estate, and his property is being mismanaged and is in danger of being wasted, to his loss, we cannot say that a verdict that he has not mental capacity to manage his affairs is without sufficient support in the evidence.

That his property has suffered from lack of proper management and measures of conservation is plain, and we think the evidence is sufficient to warrant the finding that he has not now the mental capacity to care for and preserve it, or to see that those who use it do so.

It appears that appellant's pension has heretofore been sufficient to pay his current living expenses, and perhaps more. The order appointing a guardian left the pension at appellant's disposal. This we heartily approve. Moreover, an estate in guardianship is still the property of the ward, and is always to be administered for his benefit. Not only his necessities, but his proper comfort, should be secured to him out of his own estate. His welfare is to be secured and his interests protected, in preference to those of prospective owners of the property.

The judgment and order are—*Affirmed.*

FAVILLE, C. J., and STEVENS and DE GRAFF, JJ., concur.