MARTIN OLSON, appellant, v. MILO OLSON, guardian of appellant's property, appellee.

No. 47713.

(Reported in 46 N.W.2d 1)

FEBRUARY 6, 1951.

O. J. Henderson, of Webster City, for appellant.

Larson & Larson, of Story City, and Phelan, Karr & Karr, of Webster City, for appellee.

BLISS, J.—Appellant assigns ten errors upon which he relies for reversal. In the first seven he complains of specific errors of the court in overruling his objections to questions asked lay witnesses for the purpose of eliciting their opinions that he is incompetent to manage his business and affairs.

In the remaining assigned errors, he complains that (1) the court erred in its finding that plaintiff was incompetent to handle his affairs, and that plaintiff had not sustained the burden of establishing that his property is not properly the subject of guardianship (2) the court erred in its conclusions of law that plaintiff was not entitled to terminate the guardianship, and (3) the court erred in its final decree ordering the dismissal of plaintiff's petition.

On November 18, 1946, three children of plaintiff, namely, Milo Olson, Clifford Olson and Grace Jacobson, as plaintiffs, filed their petition in the Hamilton District Court against Martin Olson (appellant herein) as defendant, alleging, in substance, that: defendant, seventy-two years of age, was living with relatives, whom plaintiffs believed were exercising undue influence over him to his financial and physical detriment; defendant "is now and has been for the past ten years senile and incompetent to manage his business affairs, and in fact to adequately care for his person"; defendant is the owner of personal property worth approximately $15,000, and "certain interests in real estate"; defendant "has had taken from his possession in recent weeks at least the sum of $7000, which he has been unable to recover; unless a guardian is appointed over defendant most of his personal property will be taken from him, and it is necessary that a temporary guardian be appointed, and upon a hearing on the merits a permanent guardian be appointed 'of the person and property of the defendant.'" The prayer of the petition was for such guardianship.

Defendant, in said proceeding, had been taken by plaintiffs therein to the office of their attorneys in Webster City on November 18, 1946. Grace Jacobson verified the petition that day. On the same day an original notice, with copy of the petition attached, was served on Martin Olson in Webster City, and then filed. On November 20, 1946, an order of the court was made appointing Milo Olson as temporary guardian of the person and

property of Martin Olson. On January 22, 1947, the court appointed Stewart Lund, as guardian ad litem of defendant, and on the same day the usual answer of such guardian was filed. On the same day the court entered an order that: the petition was this day presented, and "the plaintiffs being present in person and represented by their attorneys, Olaf Larson and Phelan, Karr & Karr, and the defendant not being present nor anyone representing him, the cause proceeded to trial upon the petition and the answer of the guardian ad litem. The court having examined the petition, the original notice and the return of service thereof, the answer of * *· * the guardian ad litem * * * and having heard the evidence and being fully advised in the premises finds that Martin Olson is an aged person and is incompetent to manage his own business and affairs. It is therefore ordered * * * that Milo Olson * * * is appointed guardian of the property of Martin Olson, and that the said Martin Olson is hereby adjudged to be incompetent."

In the instant action plaintiff alleged in his petition, filed April 15, 1949, that he "is at this time in all respects normal, mentally as well as physically, and fully capable and competent to manage his own property and property rights, and is no longer a proper subject of such guardianship." He prayed that the guardianship be terminated and that the guardian be ordered to return the property to plaintiff after a full accounting. Defendant's answer was a denial of the allegations set out above. The trial was begun on October 18, 1949 and concluded on the 20th of that month.

Defendant does not claim that plaintiff is an idiot, lunatic, person of unsound mind or mentally incompetent, but contends that he is incompetent to have control of his property, solely because Grace Olson, the wife of Roy Olson, a nephew of plaintiff, is a woman of loose morals and easy virtue who will make "wicked eyes" at him and use other seductive lures to strip him of his property. Some of the children and "in-laws" of plaintiff depict Grace and Martin as wanton in their ways. It is testified that "there is not a man around that she had not tried to have an affair with"; that Martin has a weakness for women, and he "is paying special attention to several other women besides Grace

Olson." No disinterested witness testifies in support of these charges.

Over forty pages of printed record are filled with the questioning and answers of Martin. His testimony is as rational and believable as the testimony of defendant and his witnesses. Unless otherwise noted the facts following are from his testimony.

Martin Olson was born in Denmark on March 27, 1874. He came with his parents to the United States when he was about seven years old. He had five brothers and four sisters, and only one of the latter is living. He spent his boyhood in the country about the town of Jewell and has lived in that vicinity continuously. His book education consisted of five months of two winters in a country school. On March 16, 1894, he married Belle Egland, a neighbor girl. She and her sister Martha each received forty acres of unimproved land from their father's estate. Martin had no property. The first year after the marriage they lived in the home of Carl Egland, who married Martin's sister. By mortgaging Belle's forty acres they were able to buy Martha's forty acres, so that then Belle had title to sixty acres and Martin had title to twenty acres. Martha was paid $32 an acre. They put buildings on the eighty acres and moved onto them. In 1914 Martin bought an adjoining 47.55 acres. He then had title to 67.55 acres, and his wife to sixty acres. For twenty-two years they rented additional land. By hard work and economy they made the raw land into a well-improved farm. This place, near the town of Randall is called the "North Farm." In 1934 plaintiff bought a 120-acre farm seven miles south of Story City. It is referred to as the "South Farm" in the record.

Belle Olson, plaintiff's first wife died May 15, 1930. Nine children were born to them. The oldest was killed in the first World War. Eight are surviving. Archie Olson, a carpenter in Des Moines, is the oldest living. He is married and has a family. He and his wife were witnesses for plaintiff. Mary Affolter, the next, has lived in Freeburg, Missouri, for over twenty-five years. She has two children. Jenora Larson has lived in Kenyon, Minnesota, for over twenty years. She has two boys, one of whom has a son. Grace Jacobson is the wife of Archie Jacobson, who farms near Randall. They have two boys. Both Grace and her

husband were active in procuring the guardianship and were witnesses for the guardian in this proceeding. Floyd Olson lives at Jewell and is an employee in an ice business. He has five children. Milo Olson, forty-one, lives in or near Randall and operates a corn sheller. He has four children. He is the guardian, and he and his wife were witnesses against Martin in this proceeding. Beatrice Peterson is a widow, living at Jewell. She has a grown child and two smaller children. The youngest child is Clifford, thirty-four years old. He is a bachelor. He operates a truck and works with Milo.

Mary, Jenora, and Beatrice are not shown to have participated in any way in either proceeding. Floyd was a witness for the guardian. He did not testify to any matter of importance and expressed no opinion as to the competency of his father to conduct his business. Clifford testified briefly for the guardian in the matter before us. Although he was one of the three plaintiffs in the guardianship proceeding, he testified in the instant case that "I would rather not express my opinion as to my father's competency." He also testified: "I have seen and talked to my father frequently up to the present time. Up until I went into the Army he kept his business pretty much to himself. I observed some change in the way he handled his money in 1948." He was not asked nor did he specify the "some change" he observed. With respect to Martin's talking about his business, we here note that there is no evidence in the record that he was ever talkative about his business at any time.

Clifford was fifteen years old in 1930, when his mother died. He and Beatrice were at home and remained there until Beatrice married a few years later, and when Clifford was eighteen his father gave him his "time", and he left home and thereafter provided for himself. Milo was not home the first two years after his mother's death, but then returned and worked with his father in the operation of the North Farm for seven or eight years. Part of the time they bached. Milo farmed the place under a one-year lease from his father, ending March 1, 1940.

Although Martin had no property when he married except the small dowry which his wife brought to him, by hard work, thrift, strict economy, and good management in the operation of the North Farm of approximately one hundred twenty-eight

acres, and land which he rented from others, he became prosperous. He improved and equipped his farm well, and had money on deposit in the banks. Three of these banks failed while he was a depositor in them. How much, if any, was returned to him in dividends is not shown. Nevertheless, he continued to be a money-maker. But his faith in banks had been shaken—thereafter he kept his money on his person or about his home and loaned it to friends and neighbors who needed it. His son Milo testified that as early as 1920 he observed his father carrying large sums of money on his person and putting it under his pillow at night, and that this continued during the years preceding Mrs. Olson's death; that he saw him with a large roll of currency in his pockets when they were baching, and that he carried enough money with him to buy the second farm—the South Farm in 1934. Martin testified that many of those to whom he loaned money were unable to pay their notes, and that he lost in that way $23,000.

On January 4, 1939, Martin married Mrs. Agnes Mackey, a widow in that locality. She had been his housekeeper on the North Farm for two years prior to the marriage. There is testimony that each of them had made contracts or conveyances of the real estate sometime prior to the marriage. After the marriage they lived until the first of March following on the new bride's 160-acre farm, which she had contracted to sell to one or more of her children subject to her life use. They then moved to Martin's South Farm and lived there until the wife's death on April 6, 1946. There is testimony that their marriage relations were not the most congenial. He testified that he never received a penny from her estate; also, that she had brought some of her furniture to the South Farm, and sometime later, without his knowledge, had given a bill of sale of household goods and furniture to her relatives, most of which belonged to him. Shortly after her death, believing the household property was his, he permitted his nephew, Roy Olson, and his brother Sam Olson to select such of the property as each desired. Certain of the Mackey family have filed a claim of about $365 for this property against the guardianship estate. One of these claimants was subpoenaed as a witness for the applicants in the guardianship

proceedings. We mention the matter of the furniture only because it was brought out by defendant for the purpose of showing the power of Grace to get property away from Martin. She testified that they paid Martin $187 for such furniture as they selected.

During the time that Martin and his second wife were living on the South Farm, he carried, or had about him, considerable money, $4000 of which he placed in two fruit jars and buried in the floor of the garage. He had stated that a tenant on the South Farm had stolen some of his corn and he refused to rerent the place to him. A slander suit resulted and the tenant procured a judgment of around $1500 against him. Being asked whether he had taken some of the money from the jars, he testified:

"Yes, I had a little lawsuit over at Nevada and one morning I thought I didn't want to fight it any more. My wife was standing washing dishes and I thought I would slip down and get one thousand or twelve hundred to go and pay it off; I thought she couldn't see it but when I was pretty well to the house she said, 'don't you lock the garage'—and I said no; and four or five days after, that money was gone. * * * The next spring I was over in some bushes and I found the two jars there, empty."

This incident occurred about 1940. He suspected his wife of having taken the money.

Later he bought a metal safe weighing 2900 pounds, with a combination lock, and brought it to the South Farm and kept his cash in the safe. He did not give his wife the combination of the safe, but later he discovered that she was able to open the safe. He then had the safe, containing $12,000 or more in currency, taken to his North Farm sometime in 1945. Roy Olson, a son of his brother Christ, with his wife, Grace, and daughter had taken possession of that farm on March 1, 1945, under a five-year lease. The safe was locked and he did not tell them the combination.

In the early part of 1946, Martin's wife had serious heart trouble. In February of that year, Martin had a stroke which paralyzed his left arm and left leg. His wife had difficulty in caring for him. They were unable to get help. The relatives of both helped what they could. Mrs. Olson had refused to go

to the hospital, but on April 2, 1946, she consented to be taken to the hospital. Martin at that time could recline in a chair, but was unable to help himself or to get about. Several of the relatives were at the house when Mrs. Olson was taken. Martin's daughter, Grace Jacobson, was there when Roy and Grace Olson took Martin's wife to the hospital at Story City, and Mrs. Jacobson asked them if they would not take her father on their return to their home and care for him. Roy and Grace took Martin to his old home on the North Farm, where they lived. Some of the relatives testified that they did not believe Martin would live very long, and that was also the belief of Martin. Martin's wife died four days after she entered the hospital.

Grace and Roy Olson took excellent care of Martin. He improved steadily, although he was bedfast until July 1, 1946, and was very sick and helpless for a considerable time. Thereafter he spent most of the time on a cot, during the ten months he was in their home. Grace Olson had known Martin since her childhood and they were always good friends. The home of her parents was near Martin's home. Her husband was his nephew. He was pleased to be with them and in his old home. He thought he would have to be cared for by someone as long as he lived. After he had been with them for a few weeks and was slowly getting better, he told them it would cost him $5000 to be cared for in the Old Folks Home at Story City, until he died, and he said to them that he would rather pay that sum to them if he could live with and be cared for by them during his remaining life. They accepted his offer. He told them how to open the safe, and to take out $5000 for themselves. This they did. There were still some United States bonds and $7000 in cash in the safe. About three months later, Grace Olson suggested to him that it would be better if the cash in the safe were deposited in a bank. He would not consent to this. Later, so he testified, she said to him: "I am going to take it to Ames and put it in the bank." And I said, "If you do you have to put it in my name." She took the money and Martin to Ames. He was unable to get out of the car, and she went into the bank with the money, and when she returned she told him the bank would only take $5000, and that they would take the remaining $2000 and deposit it in the bank at Jewell. This they did. Later he learned that both

deposits were in her name. He testified that he tried for two months to get the money back but did not succeed. He then told his old friend and brother-in-law, Pete Egland, of the occurrence but never mentioned it to his children or to anyone else. But some of his children learned about it, and Clarence Olson drove to the Roy Olson place and asked Martin to go for a ride "and he took me to Sam Olson's [Martin's brother] and Grace Jacobson was there and they asked me if Grace and Roy had taken any money of mine, and I told them, yes, and they said, 'Let's go to Webster City and see Karr about it.' They wanted to go and see Karr, he was the county attorney they said and had that to do with, and I rode with them, and after I got there the most they talked about was to get a guardian over me. Q. Was that the first time they had told you that? A. Yes. * * * Q. When you got here what happened to you? A. I hadn't much more than got in Karr's office—Q. Well, did they bring any action to get that money back? A. No, I don't think they did then, they didn't mention much about that. Q. What did happen to you? A. The first thing, Grace Jacobson said, 'we better have a guardian over you, have Sam Olson.' I said, no, I don't think he was much better than I was, and I said, have Milo Olson, and they said, 'all right.' Q. And Milo was appointed? A. Yes, sir. Q. Did you know their purpose in getting you up there was to put you under guardianship? A. They were afraid I might spend the money. Q. Did you know before you got up in Karr's office that is what they were up to? A. No, I didn't know that until I got there."

At her death the first Mrs. Martin Olson was the owner of about three fourths of the eighty acres which came from her father's estate. She died intestate and there was no administration upon her estate. Martin continued to farm all of the land—containing about 128.3 acres—just as he had before her death. In 1939 he conveyed an undivided one-half interest in the eighty acres to his son Archie, reserving to himself a life use. Some of the children petitioned for partition of the mother's land and Archie bought the eighty acres at the referee's sale.

At the time the guardian qualified, Martin owned the South Farm of one hundred twenty acres and about fifty-one acres of the North Farm, all free of encumbrance, and the use during

his life of the eighty acres. His personal property consisting of money deposited in banks, cash on hand and unsold crops was of an approximate value of $25,000. Shortly after the guardian qualified, he made a written contract with two firms of attorneys for the recovery of the $7000 which Grace Olson had taken from Martin. It provided that the attorneys would receive as fees one third of any money received without suit, and one half of any money received after suit was begun. After demand was made upon Grace and Roy Olson for the return of the money they employed an attorney, and after some negotiation a settlement was made by which all of the $7000 was returned and also $1500 of the $5000 which Martin had paid them for care during his life. The court approved the settlement and allowed an attorney fee of $2500 to the guardian's attorneys.

Although Martin had spent but a few months in school, he was quite competent in making the computations incident to farm and livestock operation. In checking the guardian's reports he found errors of over $400, which the guardian had failed to charge to himself. The guardian testified that Martin kept a good record of guardianship affairs.

When Martin was stricken with paralysis and it appeared that he might be a burdensome care for an indefinite time, those who have been active in instituting and maintaining the guardianship showed no desire to assume this care. It was the reason that he was grateful for the care he received in the Roy Olson home.

The record is long. Each member of the court is familiar with it and it would serve no purpose in giving further details of much extent. The incidents disclosed in the evidence of defendant that Grace Olson exercised any improper influence over Martin Olson or that it is at all probable that she may do so in the future are of so little consequence that they require no mention or comment. No one complains of his giving $5000 to the Roy Olsons to make a home for him and to care for him as long as he lived. And he was not duped out of the $7000. He entrusted it to Grace Olson to deposit in his name at a time when he was unable to get about, and she disobeyed his direction and deposited it in her name.

He made a very good recovery from a paralytic stroke and personally cares for himself better than many men of his age. He gives personal attention to his farms. He has a license to drive his car and has made quite extensive trips in it. In fifteen years of driving he said he had not "bumped a car yet." A very competent alienist, Dr. A. S. Price, of Des Moines, testified very favorably to both the physical and mental condition of plaintiff. He has but a mild grade of arteriosclerosis—no more than normal in one of his age. The record discloses no mental incompetence or unsoundness of mind; no lack of knowledge of the character, value or extent of his property. He named his children in the order of their seniority and gave details of their residence, occupation and families. Ten or more witnesses, most of whom had known him continuously since he was a young man, testified unqualifiedly as to his competence to manage his property and to properly care for his business affairs. The opposing testimony scarcely tends to refute this testimony and is very weak in comparison.

█ I. The defendant elicited from each of eight nonexpert witnesses an opinion that the plaintiff was incompetent to manage his property or to handle his business affairs. Although some of these witnesses disclaimed any intention of saying that the plaintiff is mentally incompetent, and none of them said so in those words, yet the force and effect of their opinions above-stated are that he is of unsound mind, within the meaning of section 670.2(1), Codes, 1946 and 1950. This court repeatedly has said that the test of such unsoundness is largely the incompetence of the person involved to manage his property or to handle his business affairs in a rational manner. Emerick v. Emerick, 83 Iowa 411, 413, 416, 49 N.W. 1017, 13 L. R. A. 757; Smith v. Hickenbottom, 57 Iowa 733, 738, 739, 11 N.W. 664; Seerley v. Sater, 68 Iowa 375, 376, 27 N.W. 262; Garretson v. Hubbard, 110 Iowa 7–9, 81 N.W. 174; Schick v. Stuhr, 120 Iowa 396, 398, 399, 94 N.W. 915; Muller v. DeVries, 193 Iowa 1337, 1341, 188 N.W. 885; Graham v. Clapp, 191 Iowa 1224, 1226, 1227, 184 N.W. 329; Zander v. Cahow, 200 Iowa 1258, 1264, 206 N.W. 90; Perry v. Roberts, 206 Iowa 303, 308, 220 N.W. 85; McGuire v. Moorhead, 151 Iowa 25, 28, 130 N.W. 140; Claussen

v. Claussen, 216 Iowa 269, 271, 249 N.W. 397; Guthrie v. Guthrie, 84 Iowa 372, 376, 51 N.W. 13.

The opinion of each of said witnesses that plaintiff was incompetent in the respect stated was given in answer to substantially the same question, to wit: "From your long acquaintance and association with Martin and your many visits and observations you have had of him, what is your opinion as to whether he is competent to handle his business affairs or not?"

██ ██ It has uniformly been the settled principle of law and rule of evidence of this court that before a nonexpert witness may give an opinion against the mental competency or soundness of mind of a person he must first testify to sufficient facts within his knowledge or observation that reasonably tend to support such opinion, so that the tribunal hearing the witness may be put in possession of all the facts on which the opinion is based and be enabled to properly value it. If the witness does not lay such foundation he should not be permitted to give his opinion of incompetence or mental unsoundness. State v. Stickley, 41 Iowa 232, 236, 237 (in which the court said: "Such evidence would be a mere substitution of the opinion of a non-professional witness for facts."); In re Will of Norman, 72 Iowa 84, 86–88, 33 N.W. 374; Alvord v. Alvord, 109 Iowa 113–115, 80 N.W. 306; Spiers v. Hendershott, 142 Iowa 446, 451, 120 N.W. 1058, 1060 (where the court said: "The rule is that nonexpert opinion of mental unsoundness must be based strictly upon facts and circumstances, which are first detailed by the witness."); Bales v. Bales, 164 Iowa 257, 265, 145 N.W. 673; In re Estate of Mott, 200 Iowa 948, 951, 205 N.W. 770; Campfield v. Rutt, 211 Iowa 1077, 1079, 1080, 235 N.W. 59; Ipsen v. Ruess, 239 Iowa 1376, 1387, 35 N.W.2d 82; In re Estate of Heller, 233 Iowa 1356, 1362, 1363, 11 N.W.2d 586; Storbeck v. Fridley, 240 Iowa 879, 881, 38 N.W.2d 163; Neidermyer v. Neidermyer, 237 Iowa 685, 689, 690, 22 N.W.2d 346. A nonexpert opinion of mental unsoundness based in part on matters detailed and in part upon matters not referred to in the testimony of the witness should be stricken on motion. In re Estate of Burgin, 186 Iowa 928, 929, 171 N.W. 144; In re Estate of Armstrong, 191 Iowa 1210, 1213, 183 N.W. 386; Neidermyer v. Neidermyer, supra, 237 Iowa 685, 690. In speaking of questions similar to those propounded by the defend-

ant herein to the aforesaid nonexpert witnesses, the court in Spiers v. Hendershott, supra, 142 Iowa at pages 451, 452, said: "The questions propounded to the witness Cogshall lost sight entirely of the nonexpert character of the witness, and they were put in the same form as though the witness had been an expert. There was no error, therefore, in the ruling of the court" that the questions were incompetent.

██ The questions challenged by the plaintiff herein were not based upon and had no reference to facts, if any there were, stated or referred to in any testimony of any of the witnesses who gave their opinions. The opinions were based upon associations, visits and observations, never detailed in the testimony of the witnesses. The trial court, therefore, had no knowledge of their character, their number, the times of their occurrence, or any of the surrounding circumstances, and, therefore, had no knowledge or basis for placing any value on any of the opinions. We must assume that the court believed the opinions were admissible and that it placed some weight and value on them. Whatever weight or value the court placed on them was against the plaintiff and was necessarily prejudicial to him. Plaintiff's objections to the questions and the motions to strike the answers were sound and good and the court erred in not sustaining them. We must say, as did the court in In re Estate of Kahl, 210 Iowa 903, 912, 232 N.W. 133, 136, to wit: "It cannot be successfully asserted that the answers to the interrogatories were nonprejudicial, for, as we said in Herring v. Estate of Herring, 94 Iowa 56: 'When error is shown, prejudice is presumed, and we discover no ground for holding that the presumption is overcome by other evidence.' "

██ And as said in Iowa Electric Co. v. Scott, 206 Iowa 1217, 1224, 220 N.W. 333, 337:

"When error appears, prejudice will be presumed, until the contrary affirmatively appears. [Citing decisions of this court.] In other words, an erroneous ruling is presumed to be prejudicial unless something appears from the record as a whole to show that no prejudice could have resulted. Hibbard, Spencer, Bartlett & Co. v. Zenor, 75 Iowa 471. * * * It will be presumed

that evidence received over apt and proper objections was considered by the court. Leasman v. Nicholson, 59 Iowa 259."

In Leasman v. Nicholson, 59 Iowa 259, 261, 262, 12 N.W. 270, 13 N.W. 289, an action at law, tried without a jury, the court said: "Evidence improperly admitted and excepted to constitutes a ground of reversal as much as if the case had been tried to a jury." See also Johnson v. Harder, 45 Iowa 677, 680; Arney Brothers & Crawford v. Meyer, 96 Iowa 395–397, 65 N.W. 337.

II. We will now discuss the merits of this action under the last three assignments of error. We have already noted a number of matters offered in resistance to the termination of the guardianship, and stated by the nonexpert witnesses of the defendant as having weight with them in reaching their opinions that plaintiff is incompetent to care for his property and business affairs. The narration of them shows their triviality and the lack of probative force. Other evidence, which defendant has offered to show plaintiff has not met the burden of proof which is placed upon him, tends to establish the following matters: There is some testimony that in the years of struggle and hardship when he and the mother of the children, and the children themselves, were laboriously endeavoring to acquire an adequate farm home, rear and educate the children, and build up a competence for the years ahead and old age, he furnished no more than the necessities of life, and there was little of luxury and recreation. It is unquestioned that nine children were fed, clothed, educated—a number through high school— and grew to healthy maturity. There is no evidence of any neglect, abuse or mistreatment of the family by the father.

Defendant urged upon the court that the father did not buy one of the boys a ring when he graduated from high school. But it appears that he gave that same boy the privilege of writing checks on the father's bank account while in school, and that the boy abused the favor.

His brother Sam, who the record shows has not acquired quite the affluence of the plaintiff, testified that he resented Martin's being so tight with his money, especially among his relatives—so tight that he was known as "Rich" Martin.

It is said by the defense that while his wife, Belle, was living he always stayed close to home, but that after her death, and as a widower, he was away from home more; that he "ran around", although there is no evidence of any impropriety in doing so; that he went to town occasionally and drank beer in taverns; that in doing so he spent a few dollars. But there is no evidence that he ever drank intoxicating liquors immoderately (or does now) or that he ever was a profligate or spendthrift in money matters. He is still driving his 1934 Nash that was a used car fifteen years ago when he acquired it by trading in his old car and paying a difference of $880, and which has been driven 64,000 miles. He can afford a new car.

His competence is challenged because he kept large sums of money on his person and about his home. Well, he lost many thousands of dollars by depositing it in banks and by exchanging them for promissory notes of his needy neighbors, and he lost only $3000 in the fruit jars, and he suspected that was an "inside job." He then bought a large safe, which is more precaution than most people take of any family hoard.

Some fault is found that during his life he did not attend church services as diligently as others. Most of these matters on which defendant relies took place many years ago. Singly or combined, they fall short of being an adequate defense to plaintiff's action.

As stated in the beginning of this too-long opinion, the excuse for the continuation of the guardianship by the defendant is the contention that Grace and Roy Olson, and principally the first named, by kindness, affection, allure, connivance, or some occult evil influence, obtained $7000 from the plaintiff, and that if his property is restored to him, they will despoil him of it. Grace and Milo and their spouses did not complain when plaintiff gave Grace and Roy $5000 for his future care, and Grace testified that they are willing now to pay them $5000 for that care and service. None of them desired Martin in their homes on the death of Agnes, when he was a helpless paralytic. None of them apparently desires to give him a home now. Their only interest, so they say, is to preserve his property for him, and to do so they have been actively willing to besmirch, and to take from him, his good name. A reading of this record confirms the

truth of the statement of this court in Miller v. Paulson (Salinger, J.) 185 Iowa 218, 221, 169 N.W. 203, 204, that: "* * * it is not amiss to point out that, as is not unusual in such contests, natural affection seems to be supplanted by a malicious desire to exaggerate and color." And how apropos are the words of this court (Justice Evans speaking) in Huffman v. Beamer, 198 Iowa 1113, 1117, 197 N.W. 476, 478, namely:

"In this class of cases, we scrutinize the verdict more critically and interfere more readily than in any other class of litigation. The reasons for such scrutiny are even stronger in a guardianship proceeding than in a will contest. The courts cannot fail to observe the natural tendency of selfish interest to abuse this proceeding, and to resort to it for wholly selfish purposes. The premature quarrels of expectant heirs are thrust upon the natural repose due to old age, and often result in despoiling the common benefactor and in destroying his status, and in depriving him of the liberty to do as he will with his own, and in compelling him to eat his own substance out of a stranger's hand. These are some of the considerations which impel the courts to scrutinize an adverse verdict in a case where a plaintiff is necessarily dominated by a consideration of his own supposed interest, rather than by a tender regard for the best interest of the defendant."

In the quoted case this court reversed and remanded a judgment on a verdict for appointment of a guardian.

In Richardson v. Richardson, 217 Iowa 127, 132, 250 N.W. 897, this court sustained a judgment on a directed verdict denying the guardianship, and repeated with approval the excerpt from Huffman v. Beamer set out above.

In McGuire v. Moorhead, supra, 151 Iowa 25, 26, 27, 130 N.W. 140, 141, a judgment appointing a guardian was reversed and remanded *with directions to dismiss the petition for guardian at the petitioner's cost.* The court, through Justice Weaver, said:

"In its general outline the case before us is not unlike those of its class, unfortunately too numerous, where children, rightly or wrongly, appeal to the law to take from their aged parents the control and management of their own property. That such

proceedings are sometimes proper and necessary * * * cannot be doubted * * *. On the other hand, it is equally true that the law authorizing the guardianship of a man who has lived to an advanced age and by industry, thrift, and toil has accumulated a little property is one which is easily abused, and not infrequently is made use of less to protect the parent and insure his comfort than to prevent his disposition of his estate to others than his expectant heirs."

In that case a vicious attack was made on the second wife, while here it is against Grace Olson. The court's words in that case (page 30) are pertinent here, to wit:

"Indeed, so prominently was that phase of the controversy featured on the trial below it is difficult to resist the thought that the issue of the appellant's sanity was lost sight of in the effort of the plaintiffs to thoroughly impeach the character of his wife. But she is not on trial, and at the best (or worst) her character, whether good, bad or indifferent, has only a remote bearing upon the merits of the real dispute the court is called upon to decide."

In Caltrider v. Sharon, 164 Iowa 287, 291, 145 N.W. 540, 541, a judgment appointing a guardian on a jury's verdict that the defendant was incompetent was reversed. Judge Withrow in reversing said: "A careful reading of the entire record renders it quite difficult for one to escape the conclusion that this proceeding is not a wholly disinterested one, but throughout it arises the suggestion that, while the conservation of the appellant's property is the main purpose, such protection is sought not less for others than for the defendant."

See also Graham v. Clapp, 191 Iowa 1224, 184 N.W. 329; McDermott v. Rahely, 146 Iowa 458, 125 N.W. 219; Timonds v. Hunter, 169 Iowa 598, 151 N.W. 961.

The evidence in the instant case clearly establishes that the $7000 was not voluntarily given to Grace Olson by the plaintiff, nor was it taken from him by any overpersuasion or vampire methods on her part. He had bought the safe as a place in which to keep his valuables and money. He had testified that he always liked to keep a goodly sum on hand. When she first proposed to him that it should be deposited in a bank he refused to deposit

it. He still objected some time later when she told him it would be safer in the bank. He finally acceded to her suggestion, but insisted that it be deposited in his name and said: "Nothing doing, unless it is deposited in my name." He was still an invalid at that time and unable to get about by himself. When she took the money into the banks he remained seated in the car. If he had given the money to her it would have been immaterial to him whether it was deposited, and he would not have insisted that it be deposited to his account. Just when he learned that she had deposited the money in her name or to her account does not appear, but when he was able to get about better he told his lifetime friend and brother-in-law, Pete Egland. He had been making demands on the Roy Olsons for the money, but it had not been returned. When confronted by Grace Jacobson and his brother Sam, he promptly told them the manner in which the money had been taken from him. No one disputes his contention but Grace Olson, and it is to be expected that she would deny it for her own protection, but she qualifies it by stating that she was really keeping it for him and that it was his if he needed it. The record clearly establishes that the money was entrusted to Grace Olson only for the purpose of being deposited to plaintiff's account and in his name.

The record just as clearly establishes that plaintiff had no mental unsoundness or lack of competence to control and handle his property at the time of the trial of this case. It was his condition at that time which controls, and not his condition at the time the guardian was appointed. Anspach v. Littler, 217 Iowa 787, 791, 253 N.W. 120. The best qualified expert was Dr. Price. He found the plaintiff had but "a mild grade of arteriosclerosis." Dr. Semler's opinion, based largely on hearsay examination of others, was greatly weakened by his cross-examination. Both doctors testified, and it is common knowledge, that the fact that one has hardening of the arteries does not mean that he is a senile dement or mentally incompetent.

Plaintiff's control of his property should not be withheld from him simply through fear that Grace Olson may again get some of it. It was stated in oral argument that the Roy Olsons are no longer tenants of plaintiff's land. Such a fear was emphasized in Coomes v. Mayer, 201 Iowa 405, 407–409, 205 N.W.

645, 646. That was a case in which the ward sought the termination of the guardianship of her property. The trial court denied the relief and this court reversed. The court, through Justice Evans, said:

"We are disposed to recognize a large discretion in the trial court in its refusal to terminate a guardianship. Haworth v. Stanley (Iowa), 200 N.W. 410. * * * On the other hand, we recognize that a guardianship proceeding is not adversary. Timonds v. Hunter, 169 Iowa 598. Such proceeding is both prosecuted and defended in the interest of the ward alone. We scrutinize a verdict adverse to the ward more closely than we do in a case between litigants whose interests are adversary. Huffman v. Beamer, 198 Iowa 1113.

"In the case at bar, if the plaintiff is not entitled to a termination of the guardianship upon this record, she can never be entitled to it. The guardianship of a spendthrift or of one who is subject to evil habits may well be held over the ward for a time of testing his recovery of self-control. Nothing of that kind is involved here. In the very nature of the case, the plaintiff's capacity to control her property cannot improve. The only fact appearing in the record as a reason for continuing this guardianship is the natural apprehension that her new husband has acquired sufficient influence over her to enable him to despoil her and to defraud her of her property. Such apprehensions are not to be indulged in. * * * It is not proper that we should be impelled by mere apprehensions to sustain a guardianship over a person otherwise competent. * * * The property involved was that of the plaintiff, whether the guardianship be continued or terminated. In either event, there is no reason why it should not be devoted heartily to her reasonable enjoyment. Her estate is not a mere heirloom, to be preserved intact, regardless of resulting privation to her. In view of her normal condition, she should be permitted to exercise her constitutional right to the pursuit of happiness, and to select for herself the enjoyments which she would purchase."

III. The reasoning and the decision of the court in the cited case is peculiarly fitting in the case before us. If plaintiff is

to have any relief it must be given him promptly. He will soon be seventy-seven years old. The adjudication that he is incompetent is prima facie evidence of his unfitness to control his property now or hereafter. No one can read this record and not be convinced that he has testamentary capacity. And yet the fact that he is under guardianship with respect to his property under an adjudication that he is incompetent is presumptive evidence that he cannot dispose of his property now or by will. The presumption is not conclusive, of course, but he lives under its handicap. Timonds v. Hunter, supra, 169 Iowa 598, 608, 609; Spiers v. Hendershott, supra, 142 Iowa 446, 457; In re Will of Fenton, 97 Iowa 192, 66 N.W. 99; Jones v. Schaffner, 193 Iowa 1262, 1272–1275, 188 N.W. 787.

As said in Timonds v. Hunter, supra, 169 Iowa 598, 608, 609, 151 N.W. 961, 964:

"The effect of such judgment would be to fix his status as a person of unsound mind. Theoretically, this proceeding is not adverse. * * * And yet the correctness of the result is of the highest importance to the defendant. A judgment making the guardianship permanent puts him under disability as a *non compos mentis*. It not only deprives him of the present control of his property but it renders him presumptively incapable, and perhaps conclusively so, of entering into any contract or making any testamentary disposal of his property."

We are abidingly convinced that plaintiff fully carried the burden upon him of establishing that the guardianship of his property should be terminated. Even though the challenged opinions of the defense be treated as a part of the record, and all of the evidence of the defense be given the fullest weight to which it is entitled, it was of little probative value. The court erred in dismissing plaintiff's petition and entering judgment for defendant. Judgment should have been rendered and entered for plaintiff. It is apparent that the defendant and those acting with him presented the strongest resistance available to them. The appeal is not triable de novo in this court, and the finding and judgment has the force and effect of a judgment on a jury verdict, but no more. It is not conclusive on this

court. It is not supported by substantial evidence. Nothing would be gained and much harm would likely be done if the case were sent back for retrial. It is in the interests of justice that it be disposed of by this court.

The judgment is therefore reversed and the case is remanded to the district court for entry of judgment as prayed for by plaintiff, and in conformity with this opinion.—Reversed and remanded with directions.

All JUSTICES concur except JUSTICE MANTZ, not sitting.